This is a will contest. Ina Howard, proponent of a document purporting to be the last will and testament of Gracie Crowder, offered that will for probate. Joan W. Crowder, as guardian of Warren Lee Crowder, contested the will executed by Mrs. Crowder, alleging that the decedent lacked the requisite testamentary capacity to execute a will. At the close of all the evidence, Howard filed a motion for directed verdict, which was denied. The issue of testamentary capacity was submitted to the jury. The jury found that the decedent did not have the requisite testamentary capacity at the time she executed her will. Howard filed a motion for judgment notwithstanding the verdict or, in the alternative, motion for new trial, which was denied by the trial court, and which is the basis of this appeal. We affirm.
 "[A] post-trial motion for J.N.O.V. is really just a renewal of a party's motion for directed verdict, and the J.N.O.V. motion cannot be granted unless the motion for directed verdict should have been granted. Great Atl. Pac. Tea Co., Inc. v. Sealy, 374 So.2d 877, 881 (Ala. 1979); Housing Authority of the City of Prichard v. Malloy, 341 So.2d 708 (Ala. 1977)."
Williamson v. United Farm Agency, Inc., 401 So.2d 759, 763
(Ala. 1981).
A motion for directed verdict should not be granted if there exists so much as "a mere gleam, glimmer, spark, the least particle, the smallest trace, or a scintilla in support of the theory of the complaint." Perdue v. Mitchell, 373 So.2d 650,653 (Ala. 1979), quoting from Kilcrease v. Harris, 288 Ala. 245,252, 259 So.2d 797, 802 (1972).
The record contains the following evidence. Gracie Crowder executed her will in the office of Mr. James D. Brooks, an attorney in the firm of Reams, Vollner, Phillips, Killion, Brooks and Schell, in Mobile on October 26, 1977. Mrs. Crowder died on November 25, 1982. Ina Howard, the proponent, filed a petition to probate the will in the Probate Court of Mobile County on December 29, 1982, and the will was admitted to probate on April 12, 1983. Thereafter, Joan W. Crowder, as guardian of Warren Lee Crowder, filed a will contest. Ina Howard, the proponent, operated a boarding house where Gracie Crowder lived from November 1976 until Thanksgiving Day 1982. Joan Crowder, the contestant, is the wife and guardian of Warren Lee Crowder, who is the son of Gracie Crowder, the decedent.
Mr. Brooks testified for the proponent. He stated that Mrs. Crowder asked him to prepare her will and that, after a *Page 33 
discussion, she told him she wanted to leave her estate to Ina Howard; that Mrs. Howard had taken care of her; had been a friend of hers; and that her family had abandoned her. Mrs. Crowder stated that she had a son, Warren, but that she did not want to leave him anything because he had abandoned her. Mr. Brooks stated in substance that in his opinion Mrs. Crowder was a person of sound mind and knew what she was doing. The two secretaries in Mr. Brooks's office who witnessed the will testified in substance that in their opinions the deceased was of sound mind, and they testified that the will was executed in the customary practice of the law firm. Ina Howard and an employee of the boarding house testified that Mrs. Crowder was mentally competent.
The deposition of Dr. Claude F. Brown, a psychiatrist who had treated the decedent in 1975, was read into evidence. A portion of that testimony follows:
"Q Tell me the medication you did prescribe for her.
"A While in the hospital, Stelazine.
"Q What is Stelazine given for?
 "A Stelazine is a tranquilizer, you might say. It is one of the phenothiazines. She got two milligrams three times a day which is a modest dose of that.
"Q Is it given for any specific mental ailment?
 "A Not specific. It is usually given in people who have major mental illnesses. It is a major tranquilizer rather than a minor one. She was given some mild medication, Noctec, N-O-C-T-E-C, to sleep at night, and I don't remember what other medicines she might have been given.
 "Q All right, sir. Did I ask you if you diagnosed her ailment? Did I ask you that?
"A No, sir.
"Q Let me ask you that.
 "A The first time she was in the hospital, I diagnosed her as having depressive reaction. This was in July and August of `75. She was back in the hospital in September `75. At that time, I diagnosed her as having schizophrenic reaction mixed.
 "Q All right, sir. How does this mixed schizophrenic condition affect a fellow's thinking process?
"A It can vary tremendously.
"Q Give us —
 "A It can vary from not affecting much at all to being grossly confused, disoriented, psychotic, unable to do anything hardly.
"Q Extreme ranges?
"A That is right.
 "Q Where did she fit in if you ever came to a conclusion on that?
"A She did not fit in either of the extremes.
"Q Somewhere in between?
 "A Somewhere in the middle. There was no time that I saw her that she was — that she confused [sic] in the sense of being disoriented, not knowing where she was, who she was, timewise or anything like that. She expressed no delusions, confusion about facts or events, or things of that nature. She expressed a good deal — well, nearly always of self-preoccupation, and this took the form of these bodily complaints. She greatly focused on her bodily complaints, primarily her stomach, abdomen, and her bowels, et cetera. These were never functioning properly.
 "On one occasion when she was in the hospital — I have forgotten which time — her dress was rather bizarre. I remember she wore some tennis shoes or something, red and green socks, and rather dishevelled physical appearance which generally indicates one's perception of one's self to some degree. How you dress, what kind of clothes you wear. I will say that is particularly true in ladies who are a little more attentive to clothes most of the time tha[n] we men are. With that kind of appearance, you usualy think, perhaps, something is wrong in the individual's thinking and feeling about herself, *Page 34 
which there was. This condition improved while she was in the hospital. I think there are some nurse's notes or my own notes that reflect that rather inappropriate dress."
Another physician, Dr. Thomas H. Yancey, who had treated Mrs. Crowder,[1] stated:
"Q What was her ailment, if any.
 "A I thought she was emotionally disturbed. I thought she was a schizophrenic."
Three of Mrs. Crowder's granddaughters testified that they visited Mrs. Crowder once every month or every two months after she moved into the boarding house and they said they noticed that her appearance and actions were different after she had moved into the boarding house.[2] The oldest granddaughter testified that Mrs. Crowder was not neat; that she did not put her groceries in the cabinet, but instead left them sitting around her room; that she did not start conversations; and that she gave only one-word answers when asked a question. She also stated that she felt, based upon her visits with Mrs. Crowder, that Mrs. Crowder was of unsound mind. All three of the granddaughters testified that Mrs. Crowder recognized them and other family members.
After consideration of the evidence as stated above, we are of the opinion that there was a scintilla of evidence sufficient to send to the jury the question of whether Mrs. Crowder lacked testamentary capacity. Therefore, the trial court properly denied Howard's motion for directed verdict and, accordingly, properly denied Howard's motion for judgment notwithstanding the verdict. See Williamson v. United FarmAgency, Inc., supra, and Perdue v. Mitchell, supra.
Howard's final argument is that this Court should reverse the trial court's denial of her motion for new trial because the jury's verdict is against the great weight of the evidence.
A jury verdict is presumed to be correct and will not be disturbed by this Court unless it is plainly erroneous or manifestly unjust. Williamson v. United Farm Agency, Inc., supra; Hill v. Cherry, 379 So.2d 590 (Ala. 1980). The presumption of correctness is strengthened when the trial court denies the motion for new trial. Maffett v. Roberts,388 So.2d 972 (Ala. 1980). In the instant case, the jury was presented with the question of whether the decedent possessed the necessary testamentary capacity at the time she executed her will. They found that she did not. A review of the record in this case leads us to conclude that the jury's finding is amply supported by the evidence and is not plainly erroneous or manifestly unjust.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
TORBERT, C.J., and JONES, SHORES and ADAMS, JJ., concur.
[1] Dr. Yancey could not testify as to the dates of his treatment because his records were destroyed in a hurricane in 1979.
[2] The three granddaughters ranged from 7 to 10 years of age in 1977, the year in which their testimony is based, and ranged from 15 to 18 years of age at the time of trial.