542 So.2d 1208 (1988)
William J. NAIL
v.
JEFFERSON COUNTY TRUCK GROWERS ASSOCIATION, INC., and Bert Swann.
Wayne SOJOURNER
v.
JEFFERSON COUNTY TRUCK GROWERS ASSOCIATION, INC., and Bert Swann.
86-1203, 86-1340.
Supreme Court of Alabama.
December 2, 1988.
Rehearing Denied April 7, 1989.
*1210 Izas Bahakel, Birmingham, for appellant William J. Nail.
M. Richard Hughes, Birmingham, for appellant Wayne Sojourner.
Max Hudson of Rives & Peterson, and Bert P. Taylor of Smith & Taylor, Birmingham, for appellee.
BEATTY, Justice.
These consolidated appeals arise from actions brought by William Nail and his employee, Wayne Sojourner, against the Jefferson County Truck Growers Association ("Association"), operators of the Jefferson County Farmers' Market ("Market"), and the Market manager, Bert Swann. The actions were filed following a shootout at the Market on July 4, 1981. Nail and Sojourner appeal from a trial court order granting the defendants' judgment notwithstanding the verdict ("JNOV") as to Sojourner's claim and two of Nail's five claims and granting the defendants a new trial as to Nail's remaining claims. We affirm the trial court's order as it applies to Nail, but reverse as to Sojourner.
William Nail subleased four blocks in Shed One at the Market, from which he ran his retail produce business. Billy Joe Keith was another produce retailer who also leased blocks in Shed One. In early January 1981, the Market manager, Bert Swann, informed Nail that the Block and Bay Committee had decided to terminate his sublease. On January 15, 1981, a termination of tenancy notice was served on Nail by a deputy sheriff. Nail refused to vacate and continued to pay rent. Another notice was served, but Nail again refused to vacate. The Association then filed an unlawful detainer action against Nail in district court and obtained a judgment for damages and possession. Nail appealed to the circuit court.
The Market, meanwhile, leased the four blocks occupied by Nail to Billy Joe Keith's son. Nail remained in possession, and animosity grew in Shed One between the Nail faction and the Keith faction. The hostility culminated in the July 4, 1981, shootout.
Testimony established that on several occasions before the shootout the Keiths, Nail, and Sojourner informed Swann of the growing rancor between the Nails and the Keiths. Nail and Sojourner contend that the defendants placed an extra security guard on duty in response to their request, and that this additional guard was told to watch Shed One. On the day of the shooting, however, this extra guard replaced the gate guard, who had gone home sick. The defendants did not call in another guard to patrol the Market.
That day, July 4, a fight broke out between Keith employees and Nail employees. Each group threw fireworks onto the other's produce stands. William Nail apparently fired a weapon through the roof in an attempt to break up the fight. Billy Joe Keith, however, misinterpreted this shot. Believing he was being fired upon, Keith shot Nail. Nail returned the fire, striking Keith twice in the back and striking Billy Joe Keith's father once in the neck. Sojourner was shot in the leg. A security guard arrived two minutes after the shootout was over.
After the shootout, the Market barred Nail and Keith from their blocks in Shed One. Both refused to vacate the premises, whereupon they were arrested and jailed for criminal trespass. Both were subsequently acquitted on criminal trespass charges.
*1211 Following his acquittal, Nail filed the present action against the Association and Swann. He made five charges in his complaint: (1) abuse of legal process; (2) malicious prosecution; (3) breach of covenant of quiet and peaceable possession; (4) outrageous conduct; and (5) negligent failure to prevent "trouble" that the Market had voluntarily undertaken to avoid. Sojourner made only one claim against the Association: that it had notice of a potentially dangerous situation, assumed a duty to provide adequate security, and negligently failed to carry out that duty.
Nail's case and Sojourner's case were tried together before the same jury and ended with verdicts for both plaintiffs. The Market and Swann moved for JNOV as to each of the plaintiffs' claims. The trial court granted these motions as to Sojourner's claim and Nail's negligence and outrageous conduct claims, and ordered a new trial on Nail's three other claims. From this order, Nail and Sojourner appeal.
At issue in both Nail's appeal and Sojourner's appeal is whether the trial court properly granted JNOV as to their negligence claims. In reviewing the grant of a JNOV, this Court will affirm only if there is no conflict in the evidence for the jury to resolve, and the existence of such a conflict is determined by the scintilla rule. Gary v. Kirkland, 514 So.2d 970, 971 (Ala. 1987). In Gary, this Court stated:
"[W]hen even a scintilla of evidence is present, in favor of a non-moving party, a JNOV is improper. Under Alabama law, a scintilla is described as `a mere gleam, glimmer, a spark, the least particle, the smallest trace, or a scintilla in support of the theory of the complaint.'" 514 So.2d at 972 (quoting Howard v. Crowder, 496 So.2d 31 (Ala.1986)).
Nail and Sojourner seek damages from the Association for negligently failing to prevent injuries caused by the intentional tort of a third person. In analogous cases, this Court has affirmed summary judgment for the defendant. Summary judgment has been held proper in such cases because the plaintiff typically has failed to show that the defendant had a duty to prevent the kind of injury which occurred. In Latham v. Aronov Realty Co., 435 So.2d 209 (Ala. 1983), for example, the plaintiff, Woodrow Wilson Latham, sought to recover from the owners of University Mall in Tuscaloosa after he was injured during a fight in the mall parking lot. Latham charged that the owners were negligent in failing to maintain proper security on the premises, and that the negligence was "willful" and "wanton" because the defendants had knowledge of the danger to him.
Latham offered the mall manager's testimony that the defendants knew about a previous theft of property and the abduction of another mall employee from the parking lot on a previous occasion. He also produced evidence that the mall security guard had called the Tuscaloosa Police Department on prior occasions to disperse unruly crowds in the parking lot. We held that Latham's evidence did not constitute a scintilla of proof that the mall was under a duty to prevent the kind of harm that occurred.
In Latham, we quoted with approval the Tennessee Supreme Court:
"`In our opinion the appropriate rule applicable to this case is as follows: There is no duty upon the owners or operators of a shopping center, individually or collectively, or upon merchants and shopkeepers generally, whose mode of operation of their premises does not attract or provide a climate for crime, to guard against the criminal acts of a third party, unless they know or have reason to know that acts are occurring or about to occur on the premises that pose imminent probability of harm to an invitee; whereupon a duty of reasonable care to protect against such act arises....'"
435 So.2d at 213 (quoting Cornpropst v. Sloan, 528 S.W.2d 188, 197-98 (Tenn. 1975)). We thus adopted the rule that, in order for the plaintiff to recover in negligence, there must be evidence that the owner knew or had reason to know of a probability of conduct by third persons that would endanger the plaintiff.
This Court repeatedly has applied the rule from Latham in cases which deny the *1212 plaintiff a trial. In Henley v. Pizitz Realty Co., 456 So.2d 272 (Ala.1984), for example, the plaintiff sued the owner of a parking deck from which she was abducted and raped. The plaintiff sought to establish a duty on the part of the defendant to protect her from the attack, by showing that the defendant had notice of the following crimes that had occurred in the parking deck over a ten-year period: one battery upon the owner of a car; six breakings and enterings of cars; two robberies; six thefts, one theft in which the thief was shot by a customer; and the rape that was involved in Henley. The plaintiff also argued that the presence of a monitoring system in the parking deck was a recognition of the likelihood of criminal activity and the assumption of a duty to protect her from attack. We held, however, that the evidence failed to show that the defendant knew or should have known of a likelihood of conduct on the part of a third person that would endanger her, and we therefore affirmed summary judgment for the defendant.
We applied the rule from Latham most recently in Frazier v. Laborers International Union of North America, Local No. 559, 502 So.2d 743 (Ala.1987). The plaintiff in Frazier was the personal representative of a union member who was killed by a stray bullet while waiting in an employment line on the union local's premises. The plaintiff argued that the defendants possessed constructive knowledge that criminal activity that could endanger an invitee was a probability, and that they therefore had a duty to protect their invitees from criminal attack. The decedent's brother testified in an affidavit that there were prior disturbances, fights, and arguments in which guns had been drawn and that the police had been summoned to quell these disturbances. We held that "even viewing the evidence most favorably to the plaintiff, and taking her evidence as true, it, nevertheless, falls far short of establishing that the occurrence of such criminal activity was a probability." Frazier, 502 So.2d at 746. Since the plaintiff failed to produce evidence that criminal attack was a probability, we affirmed the summary judgment for the defendants.
In the present case, Nail and Sojourner have produced sufficient evidence that the Market knew or should have known there was a probability of conduct by third persons that would endanger the plaintiffs. There is evidence that the Market knew for several weeks before the shootout on July 4 that the feuding between the Nail and Keith employees was going on. The record also reveals that the Market knew who the participants were, as well as why the hostility was mounting. Nail testified that he and his mother went to Bert Swann twice to express their fear that someone was going to get hurt in Shed One and to ask Swann to put an extra security guard on the premises. Swann himself conceded that Mrs. Nail came to him around four days before the shootout and said that Billy Joe Keith was threatening her son. Keith also testified that he went to Swann's office during the last part of June and told Swann about the tension developing in Shed One. The testimony of Swann, Nail, and Keith constitutes at least a scintilla of evidence that the Market had notice that violence could erupt between the Keiths and the Nails. Whereas the violence in previous cases such as Frazier, Henley, and Latham occurred without warning, the hostility in this case fermented over a period of several weeks before the shootout, and the Market was apprised of the growing animosity. We hold that this evidence was sufficient for the jury reasonably to conclude that violence in Shed One was foreseeable.
On the issue of whether the Market assumed the duty to protect the plaintiffs from attack by third persons, Nail and Sojourner offered evidence that three days before the shootout the Market hired a third security guard to patrol Shed One. As to whether the Market failed to exercise reasonable care in protecting its invitees, the plaintiffs offered the fact that on the day of the shooting, only two guards were patrolling the Market because one was absent due to illness. A previous Market manager, Eldridge Marsh, testified that *1213 when a guard went home sick, he usually called a replacement, and that the Market had the home telephone numbers of ten security guards who could be called in as replacements. Former City of Birmingham Police Chief James Parsons testified that the presence of a conspicuous uniformed officer tends to discourage violent crime, and that the absence of a figure of authority has the opposite effect. We conclude that Nail's and Sojourner's evidence constitutes a scintilla of proof that the Market had a duty of reasonable care to protect the plaintiffs, which it failed to exercise when it did not call in a replacement guard, and that the absence of a guard from Shed One was a contributing cause of the plaintiff's injuries.
Swann and the Market argue that even if they were under a duty to exercise reasonable care to prevent the type of injury that occurred, Nail and Sojourner are precluded from recovering because they are guilty of contributory negligence as a matter of law. The defendants argue that reasonable persons could not disagree that by participating in the shootout, Nail and Sojourner caused their own injuries.
This Court discussed the elements of contributory negligence in Brown v. Piggly-Wiggly Stores, 454 So.2d 1370, 1372 (Ala. 1984):
"In order to prove contributory negligence, the defendant must show that the party charged: (1) had knowledge of the condition; (2) had an appreciation of the danger under the surrounding circumstances; and (3) failed to exercise reasonable care, by placing himself in the way of danger. Hatton v. Chem-Haulers, Inc., 393 So.2d 950 (Ala.1980); Baptist Medical Center v. Byars, 289 Ala. 713, 271 So.2d 847 (1972).
"The question of contributory negligence is normally one for the jury. However, where the facts are such that all reasonable men must reach the same conclusion, contributory negligence may be found as a matter of law."
In this case, Nail was contributorily negligent as a matter of law. On the day of the shootout, he knew that the quarrel between himself and Keith had been escalating for two weeks and that Keith already had threatened him. He also knew that tempers were on edge at the Market and that his employees and Keith employees had tossed firecrackers onto each other's produce stands that afternoon. But when the fight broke out, he immediately pulled his gun:
"Q. And how long after this fight broke out did you pull a gun and shoot it through the roof?
"A. Maybe 10 or 15 seconds.
"Q. And after you shot the gun through the roof, what is the next thing that happened?
"A. Me and Billy Joe started shooting at each [other].
"Q. How long did that occur after you shot through the roof?
"A. Maybe 30, 45 seconds.
"Q. So within a minute of the time that the fight broke out between your employees and Billy Joe Keith's employees, gunshots were being fired at each other, you and Mr. Keith; is that true, within a minute?
"A. Close to it."
We conclude that Nail knew the situation in Shed One was dangerous on the day of the shootout, that he appreciated the danger inherent in using a gun to try to settle the fracas, and that he put himself in danger by firing his gun in an attempt to stop the fight. No reasonable person could disagree that when Nail fired his gun in the midst of the chaos in Shed One, he failed to exercise reasonable care. We therefore hold that Nail is precluded from recovering in negligence and that the JNOV as to his negligence claim was proper.
The defendants also assert that Wayne Sojourner was contributorily negligent as a matter of law, since he was present at the time of the shooting. We have held, however, that contributory negligence ordinarily is an issue for the jury.
"The question of whether the plaintiff is guilty of contributory negligence is a matter of law, and therefore one for the court to decide, only when the facts are such that all reasonable people must draw the same conclusion, and the question is for the jury when, under all the facts and circumstances, reasonable *1214 minds may fairly differ upon the question of negligence vel non."
Hatton v. Chem-Haulers, Inc., 393 So.2d 950, 954 (Ala.1980). The record reveals no facts that would compel all reasonable people to conclude that Sojourner was contributorily negligent. He had no gun when he was shot, and he was not participating in the shooting. He was shot while he was trying to escape the fight. The issue of whether Sojourner was entitled to damages from the Market in negligence properly was submitted to the jury, and the JNOV as to his claim therefore is due to be reversed.
Also at issue in this appeal is whether the trial court properly granted JNOV as to Nail's outrageous conduct claim. The tort of outrageous conduct is defined in American Road Service Co. v. Inmon, 394 So.2d 361, 365 (Ala.1980): "[O]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress."
Nail claims that the Market's efforts throughout 1981 to remove him from the premises constitute outrageous conduct and that the Market through those efforts intentionally caused him severe emotional distress. He charges the Market with various acts that he contends were outrageous conduct. These actions include: breaching the agreement to sublease him space in Shed One; failing to send him notice about the sublease; verbally pressuring him to leave the Market; barring him from the Market after the shootout; fencing him out of his business location; towing his trucks and equipment away from the Market; and billing him for storage charges on the equipment. We conclude that the Market's conduct toward Nail does not meet the requirements of Inmon, supra. The tort of outrageous conduct involves conduct vastly more extreme than that with which Nail charges the Market and emotional distress far more severe than that which Nail claims he suffered. In Inmon, we held that "[t]here is no evidence upon which reasonable people could base the belief that the company intended to cause Inmon severe emotional distress.... Any resentment springing from such impersonal treatment is not the severe emotional distress contemplated by this tort." Inmon, 394 So.2d at 367. This statement applies with equal force to Nail's case. We therefore affirm the JNOV as to his tort of outrageous conduct claim.
Nail also contends that even if JNOV is proper as to his negligence and tort of outrageous conduct claims, he should not be made to suffer a new trial on his abuse of legal process, malicious prosecution, and breach of covenant of quiet and peaceable possession claims. Nail argues that the verdict should stand on the latter three claims because the same jury that returned the $50,000 general verdict in his favor also awarded $50,000 to Billy Joe Keith in Keith's action for malicious prosecution, which was tried with Nail's action. Nail claims that in the jury's mind his "good counts" were not tainted by the "bad counts" in negligence and outrageous conduct.
Although Nail's abuse of process, malicious prosecution, and breach of covenant claims were properly submitted to the jury, they were submitted to the jury with the outrageous conduct and negligence claims. Hence, a new trial therefore is required on the properly submitted claims. Cincinnati Ins. Co. v. Little, 443 So.2d 891, 893 (Ala. 1983). In Little, the plaintiff's complaint against her insurer alleged fraud, bad faith refusal to pay, and breach of contract. The jury returned a general verdict for the plaintiff for $80,000, and the trial court overruled the defendant's motion for JNOV. On appeal, this Court found that the trial court should have granted JNOV on the count for bad faith refusal to pay, but that the court correctly submitted the fraud and breach of contract claims to the jury. We held:
"These two claims were properly submitted to the jury, but since the court also improperly submitted the bad faith claim, we cannot conclude that the jury's general verdict was based upon the properly submitted claims. Therefore, a new trial is required on these two counts...."
Little, 443 So.2d at 893. In this analogous case, we cannot conclude that the jury's *1215 general verdict was based on Nail's good claims. The trial court's grant of a new trial on Nail's abuse of process, malicious prosecution, and breach of covenant claims, therefore, is due to be affirmed. We hereby affirm the trial court's order in all respects as to plaintiff William Nail, but we reverse the JNOV as to plaintiff Wayne Sojourner. It is so ordered.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
TORBERT, C.J., and JONES, SHORES, ADAMS and HOUSTON, JJ., concur.
MADDOX, J., concurs in part and dissents in part.
ALMON and STEAGALL, JJ., not sitting.
MADDOX, Justice (concurring in part, dissenting in part).
I would affirm the judgment. I do not believe that there was evidence presented that would permit a jury to find that the shooting in this case was probable. To require the market to protect this plaintiff against a criminal act by feuding lessees, I believe, places too heavy a burden on the market.