Beverly Jean Whitehead, Carla Prewett, and Blair Marques were all tenants at Sharpsburg Manor apartments in Birmingham in 1988. In April and May of that year, a man broke into each of their apartments and sexually assaulted them. On June 11, 1988, the same man who had previously assaulted Whitehead broke into Whitehead's apartment again and raped her. Alfred Zene was apprehended that evening, and he later pleaded guilty to second degree burglary for the June 11 break-in; he was sentenced to 25 years in prison.
Whitehead, Prewett, and Marques all sued USA-One, Inc., the company hired to provide gate attendants at Sharpsburg Manor; Rime, Inc., the owner of Sharpsburg Manor; and Regal Development Company, the manager of the apartment complex, alleging negligence, wantonness, and breach of contract. They also sued Zene, alleging assault. Whitehead, Prewett, and Marques reached a pro tanto settlement with Rime and Regal Development Company, and the trial court entered a summary judgment for USA-One and made that judgment final pursuant to Rule 54(b), A.R.Civ.P.
Whitehead, Prewett, and Marques appeal from that judgment, arguing that USA-One voluntarily assumed a duty to protect them from the criminal acts of a third party. They rely onGardner v. Vinson Guard Service, Inc., 538 So.2d 13 (Ala. 1988), in support of that argument.
In Gardner, Vinson Guard Service had an oral contract with Van's Photo, Inc., to provide security guards at one of its facilities. Specifically, Vinson Guard Service was to "provide protection for vehicles in the parking lot of Van's Photo and to protect employees traveling to and from their vehicles" and to "patrol the perimeter around the facility and to make their presence evident." 538 So.2d at 14. A Van's Photo employee arrived for work one morning after a burglary had occurred and was told by the security guard on duty that it was safe to go in the building because the burglar had fled. Approximately 15 minutes after the employee went inside, she was attacked by a second burglar. In reversing the summary judgment for Vinson Guard Service on the plaintiff's negligence claim, this Court held that there was a jury question as to whether Vinson Guard Service had assumed a duty to protect the Van's Photo employees while they were inside the building. We also held that, although a breach of contract cause of action might exist for a third-party beneficiary, *Page 869 
no such cause of action existed in that case.
We find no evidence here that USA-One had a contractual duty to protect Whitehead, Prewett, and Marques or that it assumed a duty to protect them. The contract between Rime and Shelby Securities, Inc., USA-One's predecessor in interest, states at paragraph nine: "It is expressly understood and agreed that this contract is entered into solely for the mutual benefit of the parties herein and that no benefits, rights, duties, or obligations are intended or created by this contract as to third parties not a signatory hereto."
Although USA-One's duties were not expressly stated in the contract, Dorothy Holland, the manager of Sharpsburg Manor, and Barrell Lamar Walker, a former employee of USA-One, described in their depositions the extent of USA-One's responsibilities. Walker said that the gate attendants primarily checked cars entering and exiting the complex, that they kept daily logs, and that they made periodic "rounds" of the premises. Holland said that the attendants served as an afterhours answering service, i.e., that they had the telephone numbers of the maintenance person and the manager on duty in case a resident called the gate with a problem the attendant could not handle. Holland stated more specifically regarding the attendants' duties:
 "Q. All right. Other than answering — filling an answering service, did [USA-One] — did you have an understanding that they were supposed to provide anything else?
"A. Yes.
"Q. What was that?
 "A. They make rounds of all the public areas. This means they check the swimming pools to make sure at the proper time that people are out of the pools. Some of them are 9:00, some are 10:00, the pools. And they check the maintenance shop doors. They check the pump house doors. They walk through breezeways. They walk around buildings, they do all sorts of things.
". . . .
 "Q. How many — you call them guards, don't you?
"A. No, we call them gate attendants.
 "Q. All right. How many gate attendants were on duty each night?
 "A. Until — well, they fluctuated. They had different hours at different times. Depending upon the nights we had the heaviest traffic, they would — there would be one, two persons up to say, midnight. And then after midnight, to 5:00 in the morning, there would be one who rode. They wouldn't stay in the gate house at all, he rode around and made checks more frequently.
"Q. Midnight to —
"A. 5:00. Daylight, whatever time it is.
"Q. And what would happen at 5:00?
"A. He would leave.
 "Q. Would you have any gate attendants whatsoever after 5:00 in the morning?
"A. After 5:00, no.
 "Q. And the first gate attendant to show up would be at 2:00, or what time?
"A. Gate attendant?
"Q. Yes.
"A. When the office closed.
"Q. At 5:00.
 "A. Yes. And we closed at 5:30. They would come a little before that time to get information and pick up the keys and this sort of thing.
 "Q. Did you make inquiries about their whereabouts after the first Whitehead incident?
"A. Did I make —
 "Q. Did you ask these gate attendants where they were during the night of the first Whitehead incident?
"A. Yes.
"Q. What did they tell you?
 "A. They were there. They were making — or a person was. *Page 870 
"Q. One person was making rounds?
"A. Yes.
"Q. And the other person —
"A. They report back to the attendant.
"Q. Pardon me?
 "A. They report back to their station, and are there periodically.
 "Q. So, both were making rounds, reporting back to their station periodically, right? Is that what they told you?
 "A. This is what their duties were each night until a certain hour of night, and it depends on the — we have to look at the guard reports to see.
". . . .
 "Q. And now, what did you do after this Marques incident with regard to security force? Did you talk to the gate attendants? Did you talk to them, personally, at all?
"A. Uh-huh (positive response).
"Q. All right. Were any changes made?
 "A. They were — just what they're permitted to do. You know, they cannot make an arrest.
"Q. Right.
". . . .
 "A. And they just made rounds more frequently, rode around more frequently, rode on the street areas and inside the complex itself. And the police did, too, at all times. They were there day and night.
 "Q. In what way did the gate attendants follow your suggestions about more frequent patrolling?
 "A. Yes, they did [sic]. In fact, I would check on it at times to make sure they were doing that. I called the gate house to see if they were there, and asked if they made rounds.
 "Q. Did they — did they continue to use two people during the hours that you've earlier testified about, 12:00 to 5:00?
 "A. It seems that we made some changes in some of the hours, but I can't remember exactly what they were. But they still went off duty at 5:00 or 5:30 in the morning, because it was daylight at that time.
 "Q. I just want to get a bearing on like, more frequently is — they began patrolling more frequently. How long did they do that? They just spent more time in the car and less time in the gate?
 "A. No. We asked them to walk. Drive to an area, get out and walk around, and — they used to do a lot of that, anyway. We just asked them to do it more frequently.
 "Q. Did you ever have any complaints prior to any of these incidents about the gate attendants?
"A. Complaints, like?
"Q. Like they weren't doing their job?
"A. Spasmodically. Not as a usual thing.
"Q. All right.
 "A. They're only there for limited times, and they're only there for limited services to perform.
 "Q. After the first Whitehead incident, when you understood that the fellow — the assailant had said 'they're waiting for me in the car outside,' did you check with the guards to determine whether they had identified the license tag numbers or cars entering and exiting that evening?
 "A. Well, now, we don't offer security-type security. They can — people like this watch and wait until there is no one around to appear. He could be at one end of the complex, and far away from that. You can't be everywhere at the same time, no way."
(Emphasis added.)
As opposed to the duties of the security company inGardner v. Vinson Guard Service, supra, it is clear both from the contract here as well as from the deposition testimony of Walker and Holland that the employees of USA-One were at Sharpsburg Manor for the benefit of Rime. We are unpersuaded by the plaintiffs' reliance *Page 871 
on Nail v. Jefferson County Truck Growers Ass'n, Inc.,542 So.2d 1208 (Ala. 1988), to show that USA-One voluntarily assumed a duty to protect them.
Nail involved a shootout between competing produce retailers at the Jefferson County Farmers' Market over leased space at the market. The retailers sued the owner and manager of the market, alleging a negligent failure to prevent injuries caused by the intentional tort of a third person. The trial court entered a judgment notwithstanding the verdict, for the owner and manager of the Market, and the retailers appealed, arguing that the Market had voluntarily assumed a duty to protect them because, three days before the shootout, the Market had hired a third security guard to patrol the area where the violence occurred. On the day of the shooting, however, only two guards were present, because one guard was sick. The retailers produced evidence that a replacement guard was usually called in when a guard was absent and that, on the day in question, the Market did not provide a replacement guard even though it had knowledge of the "growing rancor" between the retailers. In reversing the J.N.O.V. with regard to one of the retailers, this Court stated, "[T]he hostility in this case fermented over a period of several weeks before the shootout, and the Market was apprised of the growing animosity. We hold that this evidence was sufficient for the jury reasonably to conclude that violence in Shed One was foreseeable." 542 So.2d at 1212.
Here, the fact that the gate attendants patrolled the grounds of Sharpsburg Manor "more frequently" after the second assault is insufficient to establish that USA-One undertook to protect the residents of the apartment complex. We hold, therefore, that the summary judgment for USA-One was correct, and it is due to be affirmed.
AFFIRMED.
MADDOX, ALMON, SHORES, HOUSTON and STEAGALL, JJ., concur.