A directed verdict is proper only where the nonmoving party has failed to present sufficient evidence regarding some element essential to his claim or where there is no disputed issue of fact upon which reasonable persons could differ. Because a trial judge's ruling on a directed verdict motion is based on an objective standard, and, thus, is not discretionary, review of a directed verdict on appeal is denovo. In considering the record on appeal from a judgment based on a directed verdict, this Court must view all the evidence in the light most favorable to the nonmovant and must entertain such reasonable evidentiary inferences as the jury would have been free to draw. Teague v. Adams, 638 So.2d 836 (Ala. 1994).
The evidence in the present case, viewed in the light most favorable to Finley, indicates the following: On March 17, 1991, Finley, in his capacity as the chief of police and public safety director for the Town of Camp Hill, Alabama, was dispatched by radio to a domestic disturbance at the home of Annie Pearl Patterson. Although the dispatcher's message was not entirely clear, the dispatcher informed Finley that a gun was possibly involved and she told him to meet with the complainant, W. T. Patterson (one of Ms. Patterson's sons), at a local restaurant before proceeding to the scene. W. T. Patterson told Finley that his nephew, Marquette Patterson, was at W. T.'s mother's house and was threatening to take some of her money. W. T. did not tell Finley that his nephew Marquette had a shotgun and that Marquette had shot at W. T.'s brother, Theodis Patterson (Marquette's uncle).
While en route to Ms. Patterson's house, Finley received a radio message from an officer from another police jurisdiction, James Nelms, informing him that he was already at the scene, that everything appeared to be quiet, and that he would be standing by to assist upon Finley's arrival. Based upon the information that had been provided to him, Finley did not consider the call to constitute an emergency and he proceeded to Ms. Patterson's house in a non-emergency manner. This was not the first time Finley had had to deal with Marquette Patterson. Finley had responded to numerous domestic disturbances involving Marquette. In each of those instances, Finley had been able to calm Marquette down merely by talking to him. Finley had never had to use handcuffs or a gun on Marquette, and Marquette had never attempted to pull a gun on him. Finley had responded to disturbance calls involving Marquette at both Marquette's house and Ms. Patterson's house. Both Marquette and Ms. Patterson were familiar *Page 831 
with Finley's voice. Ms. Patterson and Marquette had a very close relationship; she was capable of exercising a great deal of influence over Marquette, and on occasion she had assisted Finley in controlling him.
When Finley arrived at Ms. Patterson's house, he met with W. T. Patterson and Nelms and they all approached the house. Finley's clearly marked police car was parked where it could be seen from the front and one side of the house, and Finley was wearing a police uniform. W. T. Patterson and Finley went to the front door, and Nelms proceeded to the rear of the house. Finley knocked loudly on the front door with a heavy metal flashlight and called out to see if Marquette was in the house. After getting no response from anyone inside the house, and after W. T. Patterson had been unsuccessful in opening the door with his key (the door was blocked or latched from the inside), Finley concluded that either no one was in the house or someone had locked himself in the house and that there was little more that he could do at that time. He advised his dispatcher by radio that he was completed. Finley's refusal to force his way into the house angered W. T. Patterson, who continued to insist that Finley should do more. During this conversation, W. T. Patterson never said anything about Marquette's having had and fired a gun earlier, nor did he express concern that his mother had not responded to the door. In Finley's past experiences with Ms. Patterson, she had always responded when he knocked on her door. At this point, neither Finley nor Nelms had been told anything to substantiate the dispatcher's statement that a gun had possibly been involved in the earlier disturbance, and neither officer believed that he was in any particular danger. However, as Finley was walking off the porch Marquette shot him three times with a shotgun through a window in the house. Finley, who suffered near fatal personal injuries from those gunshots, was eventually rescued by other police officers and taken to a hospital. After an exchange of gunfire between Marquette and the other officers, during which the police used tear gas in an attempt to force Marquette out of the house, the shooting from inside the house stopped. The police entered the house, which had caught fire, and discovered that Marquette had died in the house of a self-inflicted gunshot. The police also discovered that Ms. Patterson had died in the altercation. Her body was found next to Marquette's, in a kneeling position. The position of Ms. Patterson's body suggested that she had died after Finley was shot, possibly of smoke inhalation.
A subsequent investigation of the incident revealed that Marquette had come to Ms. Patterson's house earlier on the day of the shooting and that Ms. Patterson had asked him to leave. Ms. Patterson had expressed concern that his being at her house would get her into trouble. (The record indicates that Marquette had been ordered by a judge to leave the state.) Not long after being asked by Ms. Patterson to leave the house, Marquette, who was in an agitated state of mind, was heard assembling a gun and dropping bullets or shells onto the floor. Marquette had stated that he intended to kill his wife, his father (MacArthur Patterson), and his uncle Theodis, and had stated that if he had to he would "drop" the police. Ms. Patterson was in the house in a nearby "sitting room" or "den" when Marquette stated that he would "drop" the police. Ms. Patterson was close enough to hear Marquette's threats and she was aware that Marquette had a shotgun. At some point during all of this, Marquette shot out the front door at Theodis Patterson, who, along with W. T. Patterson, had attempted to intervene. Both men were standing in the yard at that time. Ms. Patterson was aware that Marquette had shot at her son and she was either aware or should have been aware that W. T. Patterson had gone to get the police. During the entire altercation, no one heard Marquette threaten Ms. Patterson, who ultimately decided to stay in the house, apparently to protect either some money (part of which was hers and part of which belonged to another person) or Marquette. Ms. Patterson appeared to be more afraid of getting into trouble with the police if Marquette was found in her house than she was of being harmed by Marquette. At the time of the incident, Ms. Patterson, although she was over 80 years of age, was generally of sound mind, and she could see, *Page 832 
hear, walk, and talk. There was a working telephone inside the house that she was capable of using. At no time did Ms. Patterson notify the police by telephone that a clearly disturbed Marquette had locked himself in her house with a shotgun, and at no time did Ms. Patterson call out to Finley or Nelms to warn that they were in danger of being shot.
Finley filed this action against Ms. Patterson's estate, alleging negligence and wantonness on Ms. Patterson's part in failing to warn him that Marquette was on the premises with a loaded shotgun and that he was in the frame of mind to use it against the police. The trial judge directed a verdict for the estate at the close of Finley's case-in-chief, explaining that, in his opinion, the evidence was purely speculative as to whether Ms. Patterson could have warned Finley of the impending danger posed by Marquette.
In Saccuzzo v. Krystal Co., 646 So.2d 595, 596 (Ala. 1994), this Court stated:
 "The general rule in Alabama is that 'absent special relationships or circumstances, a person has no duty to protect another from criminal acts of a third person! Moye v. A.G. Gaston Motels, Inc., 499 So.2d 1368, 1370 (Ala. 1986). 'Special circumstances' exist only when the defendant 'knew or had reason to know of a probability of conduct by third persons that would endanger the plaintiff.' Nail v. Jefferson County Truck Growers Association, Inc., 542 So.2d 1208, 1211 (Ala. 1988). For the 'special relationship' exception to apply, there must be a relationship either between the premises owner and the third party or between the premises owner and the plaintiff. Young v. Huntsville Hospital, 595 So.2d 1386 (Ala. 1992), citing Restatement (Second) of Torts, § 315 (1965). Prior criminal incidents can indicate knowledge on the part of the owner, but such incidents are by no means conclusive on the question of knowledge. Williams v. First Alabama Bank, 545 So.2d 26, 27 (Ala. 1989)."[5] *Page 833 
My review of the evidence does not indicate that there was the kind of special relationship between Ms. Patterson and Marquette or between Ms. Patterson and Finley that would have imposed a duty on Ms. Patterson to protect Finley from Marquette. Neither Ms. Patterson's familial relationship with Marquette, nor her occasional contact with Finley in his capacity as a police officer, approaches the kind of relationship that would create on Finley's part a unique dependence on Ms. Patterson for protection. For examples of cases where such a special relationship has been found, seeThetford v. City of Clanton, 605 So.2d 835 (Ala. 1992) (innkeeper-guest); and Young v. Huntsville Hospital,595 So.2d 1386 (Ala. 1992) (hospital-incapacitated patient).
The existence of special circumstances may, however, create a duty on the part of a premises owner to take reasonable steps to protect another from the criminal acts of a third party. Those circumstances exist only when the premises owner knows or has reason to know of a probability of conduct by a third party that will endanger the plaintiff. This exception to the general rule of nonliability arises where the particular criminal conduct is foreseeable to the premises owner. Moye v. A.G.Gaston Motels, Inc., supra. This Court recognized in Moye that it is difficult to impose such a duty on a premises owner, even when previous criminal incidents are cited as evidence that the premises owner knew that future criminal activity on the premises was foreseeable. However, it is not impossible to impose such a duty. Although evidence of previous criminal incidents may be used to establish knowledge on the part of a premises owner, other evidence may also suffice, provided it indicates that the premises owner knew or had reason to know of a probability of criminal conduct by a third party that would endanger the plaintiff.
After carefully reviewing the evidence, and after indulging all reasonable inferences in favor of Finley, I conclude that Finley presented sufficient evidence to have his claims considered by the jury. The evidence indicated that Ms. Patterson was aware of two important things on the day of the shooting — that Finley had come to her house in his capacity as a police officer to investigate a reported domestic disturbance there and that a clearly disturbed and armed Marquette was hiding on the premises and threatening to kill family members and police officers. Although the evidence does not disclose that Marquette had a history of domestic violence involving the use of a gun, I nonetheless conclude that the evidence of Ms. Patterson's knowledge of Marquette's bizarre and particularly vicious behavior on the day of the shooting, coupled with the evidence of her knowledge that Finley, based on his previous experiences with Marquette, would not be suspecting Marquette to assault him with a shotgun, created a question for the jury as to whether Marquette's "ambush" of Finley was foreseeable to Ms. Patterson (i.e., whether she knew or had reason to know that Marquette, given his state of mind, would probably shoot at an unsuspecting police officer). Such "specialized knowledge" that criminal activity is a probability is sufficient, in my opinion, to create a duty on the part of a premises owner to take steps to protect a licensee or an invitee present on the premises. Moye, supra. I would order a new trial and would require that the jury be instructed that if it found that Marquette's assault on Finley was foreseeable to Ms. Patterson, then Ms. Patterson was under a duty to alert Finley of the danger.
The evidence, again viewed in the light most favorable to Finley, as it must be under our standard of review, also indicates to me that Ms. Patterson was physically and mentally able to warn Finley of the danger. The evidence indicated that Ms. Patterson was generally of sound mind and that she could walk, talk, see, and hear (how well she could do those things was a question for the jury); that she had always been very close to, and able to talk with, Marquette; that her movements within the house and her ability to speak were not restricted (there is no evidence that she was held hostage by Marquette); and that she had been alive when Finley was shot. The exact reason or reasons why Ms. Patterson took no steps to alert Finley of Marquette's presence may never be known. However, one could reasonably infer from the evidence that Ms. Patterson was capable of warning Finley of *Page 834 
the danger posed by Marquette. Whether Ms. Patterson could have warned Finley and whether she acted reasonably or unreasonably in not doing so, or whether she acted in conscious disregard of the circumstances, are all questions better reserved to the factfinder. I conclude only that the evidence was sufficient to submit to the jury the question whether Ms. Patterson had a duty to warn Finley of the danger lurking within her house, and, if so, whether she breached that duty.
There was evidence of the standing relationship between Ms. Patterson and her grandson, Marquette, from which the trier of facts could reasonably infer that Ms. Patterson could have warned Finley or Nelms, without physical danger to herself; but, in my opinion, that was a decision for the trier of the facts, not for the trial court or this appellate court. I fear that the majority's decision today will make law enforcement officers sitting ducks when they are on private property doing their legal duty, because the majority opinion holds that, as a matter of law, law enforcement officers assume the risk of physical danger inherent in police work. I cannot go that far. I am fully aware of the policy arguments that can be made against allowing law enforcement officers to recover damages from premises owners for injuries arising out of dangers that are inherent in police work. See Premises Liability "Persons," § 6.4 (2d ed. 1995). Police officers face many dangers in the line of duty, dangers that naturally and predictably arise from face-to-face encounters with criminals and desperate situations. However, I do not think that it is necessarily an inherent risk of police work that a premises owner, who is aware of a police officer's presence, will not alert that police officer to a concealed and dangerous condition (person) on the premises, if the premises owner is aware of the dangerous condition and is physically and mentally capable of providing a simple warning without physical danger to the premises owner. For a case somewhat similar to this one, seeWilliams v. Wiewel, 36 Ill. App.3d 478, 344 N.E.2d 34 (1976).
For the foregoing reasons, I would reverse the judgment and remand the case for further proceedings.
[5] I note Finley's contention that he should be classified as an invitee for purposes of determining whether Ms. Patterson was under a duty to warn him of the danger posed by Marquette. In the only Alabama case I have found dealing with this question, this Court stated:
 "An officer of the law, acting in the line of duty, is not a trespasser. Neither is he an invitee to whom the [premises owner] owes a duty to keep [the] premises in a reasonably safe condition. He is deemed a licensee, free to enter on the premises as they are, caring for his own safety as for any hazards on the premises . . . ."
Louisville N.R.R. v. Griswold, 241 Ala. 104, 106,1 So.2d 393, 395 (1941). There is a split of authority as to whether a police officer should be classified as an invitee or as a licensee. See Harper, James, Gray, The Law of Torts, § 27.14(2) (2d ed. 1986); Premises Liability "Persons", § 6.1 (2d ed. 1995); J. Page, The Law of Premises Liability, § 5.9 (2d ed. 1988); 62 Am.Jur.2d Premises Liability §§ 422-424 (1990). Based on the record before me, I find it unnecessary to classify Finley as either a licensee or an invitee. Finley's action is based on allegations that Ms. Patterson was under a duty to warn him that a criminal act was about to be committed by a third party. The duty discussed in Saccuzzo, supra, and in a well-established line of Alabama cases dealing with a premises owner's liability for the criminal acts of a third party, is applicable in this case regardless of whether Finley is classified as an invitee or as a licensee. See, e.g., Moyev. A.G. Gaston Motels, Inc., 499 So.2d 1368 (Ala. 1986) (involving the more typical situation where the injured person is an invitee on the premises); and Prentiss v. EvergreenPresbyterian Church, 644 So.2d 475 (Ala. 1994) (recognizing the general rule that a premises owner owes a licensee not only a duty to abstain from willfully or wantonly injuring the licensee, but also a duty to avoid negligently injuring the licensee after the premises owner discovers that the licensee is in danger).
At this point I note that I also find unpersuasive Finley's contention that this case is controlled by Orr v. Turney,535 So.2d 150 (Ala. 1988). I view the present case as involving a dangerous condition on the premises that Ms. Patterson allegedly was aware of and negligently or wantonly failed to warn Finley of. See, e.g., King v. Breen, 560 So.2d 186 (Ala. 1990) (dangerous animal on the premises held to be a dangerous condition); Casey v. Oliver, 577 So.2d 453 (Ala. 1991) (medication left where child could easily get to it held to be a dangerous condition); Baldwin v. Gartman, 604 So.2d 347 (Ala. 1992) (slab of concrete left balanced on a dolly held to be a dangerous condition). In Orr the premises owner injured a licensee (child) when, while running with a pan of burning grease, she spilled some on the child. That conduct had nothing to do with the condition of the premises (i.e., the premises owner's affirmative conduct was the immediate cause of the injury). See Baldwin v. Gartman, supra. The present case does not involve allegations of the kind of "active" or "affirmative" conduct or negligence on the part of a premises owner that would invoke the standard discussed in Orr.