Lois C. ARMSTRONG, As Trustee for the Next of Kin of Erling G. Armstrong, Decedent, et al., Appellants,

v.

Wallace M. MAILAND and Mary Ellen Mailand, Individually and d. b. a. Mailand Construction Company, Respondents,

L. P. Gas Equipment, Inc., Respondent,

E. S. P., Inc., Respondent,

Transunion Company, et al., Respondents,

International Harvester Company, Defendant,

Trinity Industries, Defendant,

Corken Pump Company, Defendant,

Dahlen Transport, Inc., Respondent,

Skelly Oil Company, Respondent,

and

DAHLEN TRANSPORT, INC., Wallace M. Mailand and Mary Ellen Mailand, Individually and d. b. a. Mailand Construction Company, third party plaintiffs, Respondents,

International Harvester Company, Third Party Plaintiff,

v.

CITY OF WEST ST. PAUL, Third Party Defendant, Respondent.

No. 48380.

Supreme Court of Minnesota.

Feb. 9, 1979.

DeParcq, Anderson, Perl, Hunegs & Rudquist and Stephen S. Eckman, Minneapolis, for appellants.

Van Eps & Gilmore, Duane E. Arndt and Wayne D. Tritbough, Lasley, Gaughan, Reid & Stich, Robins, Davis & Lyons, Minneapolis, for Mailand et al.

Mahoney, Dougherty & Mahoney and Richard Mahoney, Minneapolis, for L. P. Gas Equipment, Inc.

McEachron & McEachron and Thomas McEachron, Bloomington, for E. S. P., Inc.

Barnett, Ratelle, Hennessy, VanderVort, Stasel & Herzog, Minneapolis, for Transunion Co. et al.

Murnane, Murnane, Conlin & White and Robert Murnane, St. Paul, for Dahlen Transport, Inc.

Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, Minneapolis, for Skelly Oil.

Dean K. Johnson, Bloomington, Hansen, Dordell & Bradt and William Bradt, St. Paul, for City of West St. Paul.

TODD, Justice.

On January 11, 1974, a fire occurred at a liquified petroleum (LP) gas storage facility. The facility was located at an apartment complex and LP gas was being delivered at the time. The fire started at the delivery truck. After the fire department arrived, the fire spread to the 11,000-gallon storage tank. While the fire was being

fought, the LP storage tank exploded, killing three firemen. There is evidence of negligence, fire code violations, and product defects attributable to some of the defendants. The trial court granted summary judgment to the defendants under the "fireman's rule." We affirm.

Wallace M. Mailand is the owner and developer of an apartment complex located in West St. Paul, Minnesota. The buildings were heated by natural gas, but the supplier required the owner to provide alternate, standby facilities so that the supply of natural gas could be interrupted during periods of excess demand caused by cold weather. Mailand decided to use LP gas as his standby source of fuel. To facilitate the changeover from natural gas to LP gas, it was necessary to install vaporizing equipment which blended air with the LP gas to make the product compatible with the furnace equipment. The vaporizer used an open flame in its operation.

At the time of the original installation in 1968, seven 1,000-gallon LP storage tanks were used. A redwood weave type fence was constructed around the tanks and vaporizing equipment. Thereafter, a wooden roof was placed over the installation for esthetic reasons. This installation did not operate effectively. Thereafter, in the fall of 1972, Mailand decided to replace the seven 1,000-gallon LP storage tanks with a single 11,000-gallon tank. Skelgas, the LP gas supplier, referred Mailand to L. P. Gas Equipment, Inc., to make the changeover. L. P. Gas Equipment contacted Union Tank Car Company and arranged to purchase an 11,000-gallon LP tank which had been used on a railway car. Union Tank knew of the intended use of the tank. Union Tank agreed to prepare the tank and provide a suitable retested relief valve. Union Tank removed insulation from the tank which necessitated the installation of a different relief valve. Union Tank did not install a new valve and did not advise L. P. Gas Equipment to recheck the valve or tank. L. P. Gas Equipment relied upon the certification furnished by Union Tank at the time of delivery and made no independent inspection of the tank or valve.

L. P. Gas Equipment submitted plans of the installation to the state fire marshal whose office gave its approval. The approved plans were submitted to the West St. Paul fire chief who objected to the east-west orientation of the tank, preferring a north-south orientation for safety reasons based on information available to him at that time. However, because the fire chief believed that the city had no authority to countermand the approval by the state fire marshal, the installation was completed. To accomplish the changeover, the structure around and above the original installation was removed and replaced after the 11,000-gallon tank had been set in place. As a result, the 11,000-gallon tank and vaporizing unit were contained within the confines of a single structure with no fire wall between them as is apparently required by the fire code.

On the evening of January 11, 1974, Dahlen Transport, Inc., pursuant to its contract with Skelgas, was delivering fuel to the installation. The LP gas was transported by truck to the site and the delivery hose was connected to the storage tank. A vapor hose, which is supposed to be connected between the storage tank and the delivery truck to equalize pressure, was not connected by Dahlen's employee. This was a direct violation of the trucking company's order to its employees. The driver activated the pumping mechanism on the truck. He returned to the cab of the truck, which also is in violation of company rules. The meter on the truck measuring the flow of LP gas apparently was improperly installed. It also had a broken relief line which caused LP gas to escape and collect near the meter and on the ground under the meter.

Later, the driver of the truck left the cab for the purpose of checking the delivery. While near the meter located on the side of the truck, the LP gas ignited. The flames engulfed the driver. He rolled in the snow to extinguish the flames and proceeded to the apartment complex where he had observed some people. The delivery truck was not shut off. The fire department was notified, and it arrived in a few minutes.

When the fire department arrived, the fire was burning at the truck in the vicinity of the meter and on the ground underneath. One of the firemen approached the truck to shut off the supply of LP gas, but he was unsuccessful. At this time, the fire expanded rapidly to the storage facility. The spread of the fire from the truck to the storage facility was described as giving the appearance of a huge blowtorch in operation. The spread of the fire was apparently caused by a burning through of the supply line from the truck to the tank which permitted the escape of LP gas.

The storage facility was engulfed in flames. The recommended procedure at that time for fighting LP fires was to attempt to cool the storage tank with water, avoid locating personnel at the ends of the tank which were regarded as being more vulnerable to being jettisoned, and attempt to shut off the supply of gas to the fire. Within a few minutes after the spread of the fire, water was being directed to the storage facility from a snorkel operated above the tank and off to the side of the tank. Water was also being directed onto the tank from a fire gun located on a truck. Pressure in the 11,000-gallon tank continued to rise. The firemen heard the relief valve release and continued to pour water on the fire. Within a few minutes, a BLEVE (boiling liquid expanding vapor explosion) occurred. The force of the explosion was compared to the thrust of a Saturn rocket. Firemen Erling G. Armstrong, John R. Heuer, and Richard N. Neikirk were killed. This action for wrongful death was commenced.

The evidence indicates that the firemen in West St. Paul were familiar with the term "BLEVE" and had received training in combating such fires. In addition, because of small fires at the prior installation, the Mailand installation had been the subject of discussion and practice runs by the West St. Paul Fire Department. Various firemen testified in depositions that they and their fellow firemen knew that a BLEVE was a risk at every LP gas storage tank fire.

The complaint alleges negligence of various defendants, violations of fire codes, strict products liability, and maintenance of an abnormally dangerous instrumentality. The trial court, relying on our decision in *Shypulski v. Waldorf Paper Products Co.,* 232 Minn. 394, 45 N.W.2d 549 (1951), found there were no genuine issues of material fact which would permit recovery under the *Shypulski* standards. The trial court further declined to consider the strict liability and ultrahazardous instrumentality issues. The trial court did not rule on the motion of the city of West St. Paul for dismissal of third-party actions against it seeking indemnity and contribution.

The issues presented on appeal are:

(1) To what extent does a fireman assume, in the primary sense, the risks associated with firefighting?

a. Under the proper circumstances, may the doctrine of primary assumption of the risk be applied to relieve a landowner of a duty toward firemen which is otherwise owed to third parties?

b. Under the proper circumstances, may the doctrine of primary assumption of the risk be applied in negligence per se and strict liability actions to relieve a defendant of a duty toward firemen which is otherwise owed to third parties?

c. If the doctrine of primary assumption of the risk may be applied under the proper circumstances, does the record in this case indicate as a matter of law that the firemen assumed, in a primary sense, the risk causing their injuries?

(2) Collateral issues:

a. Are the firemen within the class of persons protected by fire codes?

b. Is recovery under Restatement, Torts (2d), § 402A, strict products liability, available to the firemen bystanders?

c. Did the defendants engage in an abnormally dangerous activity?

d. Is the city of West St. Paul liable for indemnity or contribution?

1. Predominant and overriding in the decision of this case is the initial determina-

tion as to whether, and to what extent, a fireman assumes the risk of firefighting. A determination that primary assumption of the risk is available to the defendants will bar the plaintiffs' recovery under any of the theories advanced by plaintiffs.

a. We shall first consider this determination as it relates to the landowner's duty of care. Our earlier Minnesota cases adopted the so-called "fireman's rule"; namely, that an owner or occupant of land owes no duty to a fireman to keep the premises in a reasonably safe condition. See, *Hamilton v. Minneapolis Desk Mfg. Co.*, 78 Minn. 3, 80 N.W. 693 (1899), and *Mulcrone v. Wagner*, 212 Minn. 478, 4 N.W.2d 97 (1942). More recently in the *Shypulski* case, this court created an exception to the fireman's rule. In *Shypulski*, the firemen had extinguished a fire at the defendant's warehouse and proceeded to enter the building to be sure the fire was out. A cement block wall collapsed, injury the plaintiff fireman. Agents of the defendant owner were present at the time. They observed the fireman entering the warehouse. They did not warn the fireman that the company had information that the wall could not stand lateral pressure and was a "trap." Our court affirmed the trial court's overruling of a demurrer to the complaint. This court, in describing the status of firemen, stated they are not licensees or invitees in the usual sense, but they are sui generis. This court held that a landowner had a duty to warn firemen of hidden perils if the landowner knew of the peril and had an opportunity to warn the firemen. It is this test the trial court applied in granting summary judgment for the defendants herein.

These Minnesota decisions involve the issue of a fireman's primary assumption of the risk. This is so because the classification of a fireman as a "licensee," "invitee," or "sui generis" is just another means of determining the extent to which a fireman primarily assumes the risk and thereby relieves the landowner of his duty to keep the premises in a safe condition. The Supreme Court of New Jersey described the interrelationship between the fireman's rule and primary assumption of the risk as follows:

"* * * The rationale of the prevailing rule is sometimes stated in terms of 'assumption of risk,' used doubtless in the so-called 'primary' sense of the term and meaning that the defendant did not breach a duty owed, rather than that the fireman was guilty of contributory fault in responding to his public duty." *Krauth v. Geller*, 31 N.J. 270, 273, 157 A.2d 129, 130.

■ Thus, classification of a land entrant and limiting the duty owed to that entrant is merely a restatement of the entrant's primary assumption of the risk. This conclusion is reflected in the *Shypulski* decision where this court stated (232 Minn. 401, 45 N.W.2d 553):

"* * * Although firemen assume the usual risks incident to their entry upon premises made dangerous by the destructive effect of fire, there is no valid reason why they should be required to assume the extraordinary risk of which they might easily be warned."

It is important to understand the relationship between primary assumption of the risk and the classification of land entrants because two recent Minnesota decisions cast doubt on the continued validity of the *Shypulski* rule. In *Springrose v. Willmore*, 292 Minn. 23, 192 N.W.2d 826 (1971), this court abolished, in part, the doctrine of assumption of the risk. In *Peterson v. Balach*, 294 Minn. 161, 199 N.W.2d 639 (1972), this court held the status of licensee or invitee was no longer conclusive in determining a landowner's duty to entrants. It is necessary to examine the impact from each of these cases on the *Shypulski* rule.

■ In *Springrose v. Willmore, supra*, this court held that primary assumption of the risk remains as an absolute bar to the plaintiff's recovery, whereas secondary assumption of the risk becomes a question of comparative negligence. Primary assumption of the risk is not really an affirmative defense; rather, it indicates that the defendant did not even owe the plaintiff any duty of care. The court in *Springrose* said (292 Minn. 24, 192 N.W.2d 827):

"* * * Primary assumption of risk, express or implied, relates to the initial issue of whether a defendant was negligent at all—that is, whether the defendant had any duty to protect the plaintiff from a risk of harm. * * * The limited duties owed licensees upon another's property * * * are illustrative."

On the other hand, secondary assumption of risk is a type of contributory negligence where the plaintiff voluntarily encounters a known and appreciated hazard created by the defendant without relieving the defendant of his duty of care with respect to such hazard.

We conclude that *Springrose* has no significant impact on the *Shypulski* rule. *Springrose* held that primary assumption of the risk is still available to relieve a defendant of his duty to plaintiff; therefore, there still is validity in the *Shypulski* rule which relieves a landowner of his duty to firemen except for a duty to warn of hidden dangers. The *Shypulski* rule, consistent with *Springrose*, can be rephrased as follows: A fireman assumes, in a primary sense, all risks incident to his firefighting activities except for hidden risks which are known by the landowner.

We have concluded that *Springrose* does not, in itself, significantly affect the *Shypulski* decision. However, the *Shypulski* decision does seem to be affected by *Peterson v. Balach, supra,* and other cases dealing with the duty of landowners to entrants. In *Peterson*, the court held that the distinction between licensees and invitees was no longer determinative of the duty owed by landowners to entrants, although the status of the entrant was a factor in assessing negligence. The court concluded that a landowner has a duty of reasonable care for the safety of all entrants other than trespassers.

It is argued that *Peterson* has the effect of abolishing the *Shypulski* classification of firemen as sui generis. This argument has merit because the sui generis classification in *Shypulski* was, on a scale of care owed, somewhere between licensee and invitee. Hence, it is argued, the *Peterson* decision to merge the licensee-invitee classification engulfed the *Shypulski* sui generis classification. We agree.

However, the abolition of the fireman's sui generis classification does not mean that landowners owe firemen a duty of reasonable care with respect to all risks. The landowner owes the fireman a duty of reasonable care only with respect to risks which are not assumed, in the primary sense, by the fireman. Although it is argued that the abolition of the sui generis classification mandates abandonment of the fireman's rule, we think sounder reasoning is reflected in the approach recently set forth in the California decision of *Walters v. Sloan*, 20 Cal.3d 199, 142 Cal.Rptr. 152, 571 P.2d 609 (1977). In considering the validity of the fireman's rule after abolition of the licensee-invitee distinction, the court said (20 Cal.3d 203, 142 Cal.Rptr. 154, 571 P.2d 611):

"In recent years, the rule has been repeatedly attacked as being 'behind the times,' based on outdated concepts of tort liability. However, the courts in this and other jurisdictions have answered the attacks, pointing out the rule is premised on sound public policy and is in accord with—if not compelled by—modern tort liability principles. * * *

"While modernizing has brought the law of landowner liability into accord with current concepts of tort liability by eliminating formalistic categories—invitees, licensees, trespassers (see *Rowland v. Christian* [1968] 69 Cal.2d 108, 70 Cal. Rptr. 97, 443 P.2d 561)—the fireman's rule is not based on such categorizations. Under the old rule, all persons within its scope were denied recovery when injured while voluntarily confronting a known peril with full realization of the risk. (See, e. g., Rest. 2d Torts, *supra*, §§ 343A., 496A.) The changes wrought by *Rowland* do not relate to the fireman's rule.

"Rather, the fireman's rule is based on a principle as fundamental to our law today as it was centuries ago. The principle is not unique to landowner cases but

is applicable to our entire system of justice—one who has knowingly and voluntarily confronted a hazard cannot recover for injuries sustained thereby."

We hold, therefore, that landowners owe firemen a duty of reasonable care, except to the extent firemen primarily assume the risk when entering upon the land. Firemen assume, in a primary sense, all risks reasonably apparent to them that are part of firefighting. However, they do not assume, in a primary sense, risks that are hidden from or unanticipated by the firemen. Thus, a fireman may not recover damages from a landowner if his injury is caused by a reasonably apparent risk. But, he may recover if his injury is caused by a hidden or unanticipated risk attributable to the landowner's negligence and such negligence is the proximate cause of the injury.

Under this approach, we conclude that firemen are not classified as licensees, invitees, or sui generis. Rather, they are owed the same duty of care as all entrants, except to the extent they assume the risk in a primary sense. There are at least three important aspects to changing the focus from the fireman's classification to the fireman's primary assumption of the risk. First, it results in consistency with the policy set forth in *Peterson v. Balach, supra,* of eliminating classifications of land entrants. Secondly, the change in focus facilitates application of the fireman's rule to defendants other than owners and possessors of land. A third aspect to the change of focus is a change in the substantive law. Presently, under *Shypulski,* a landowner is not liable to the fireman unless the landowner knows of the hidden danger and negligently fails to warn the fireman of that danger. By concluding that the sui generis classification is abolished in accordance with *Peterson v. Balach, supra,* and that landowners owe firemen a duty of reasonable care with respect to risks that are hidden or unanticipated by the firemen, it is obvious that the *Shypulski* requirement of knowledge of the danger by the landowner and of opportunity to warn would be eliminated. In other words, a landowner could conceiva-

bly be held liable to the fireman for negligence in allowing the existence of a hidden danger even though the landowner did not know of the danger or have an opportunity to warn. Of course, a jury may still consider the landowner's knowledge and opportunity, or lack thereof, in determining negligence, but lack of knowledge and opportunity no longer bars recovery as a matter of law.

b. We have concluded that primary assumption of the risk may be invoked under the proper circumstances to relieve a landowner's duty of reasonable care toward firemen with respect to reasonably apparent risks that are part of firefighting. We turn now to the question of whether the duties of the other defendants, who are not landowners, may be similarly relieved.

The theories of recovery advanced against the other defendants are negligence per se, strict liability for an abnormally dangerous activity, and strict products liability. We have little difficulty concluding that primary assumption of the risk precludes recovery in an action predicated on negligence per se. Negligence per se merely involves a type of negligence, and therefore the doctrines barring recovery in negligence actions generally bar recovery in actions based on negligence per se. See, *Scott v. Independent School Dist. No. 709,* 256 N.W.2d 485, 488 (Minn.1977); Restatement, Torts (2d), § 496F. Because we have concluded a fireman's primary assumption of the risk may, under the proper circumstances, preclude recovery on the basis of a landowner's negligence, we conclude similarly that primary assumption of the risk may preclude recovery in an action predicated upon negligence per se.

Greater difficulty is presented on the issue of whether primary assumption of the risk—which typically is a doctrine used in negligence law—may be invoked in an action predicated upon strict products liability or strict liability for an abnormally dangerous activity. We have never squarely addressed the issue of whether the doctrine of primary assumption of the risk may be ap-

plied to actions predicated upon strict liability, and, in view of recent criticism of the doctrine, we find it necessary to reevaluate the nature and applicability of the doctrine.

■■■■ The doctrine of primary assumption of the risk technically is not a defense, but rather a legal theory which relieves a defendant of a duty which he might otherwise owe to the plaintiff with respect to particular risks. *Olson v. Hansen*, 299 Minn. 39, 216 N.W.2d 124 (1974); *Springrose v. Willmore, supra.* The doctrine is sometimes confused with secondary assumption of the risk. Secondary assumption of the risk occurs when the plaintiff voluntarily encounters a known, appreciated risk *without* an attendant manifestation by the plaintiff that he consents to relieve the defendant of his duty. *Olson v. Hansen, supra.* See, *Gaston v. Fazendin Construction, Inc.* 262 N.W.2d 434 (Minn.1978); 2 Harper & James, Torts, § 21.1, p. 1162. Primary assumption of the risk, therefore, is a doctrine which defines the limits of the defendant's duty. Its application is dependent upon the plaintiff's manifestation of consent, express or implied, to relieve the defendant of a duty. Its application is not dependent upon the wisdom or reasonableness of the plaintiff's consent. It is for this reason that we, in *Springrose*, declined to view primary assumption of the risk as a type of comparative fault rather than as an absolute bar to recovery.[1]

The issue of whether assumption of the risk should apply to strict liability actions has been the subject of various commentaries. See, Keeton, *Assumption of Product Risks*, 19 Sw.L.J. 61; Twerski, *Old Wine in a New Flask—Restructuring Assumption of Risk in the Products Liability Era*, 60 Iowa L.Rev. 1; Comment, 3 Wm. Mitchell L.Rev. 241; Note, 2 Wm. Mitchell L.Rev. 235. In

analyzing the issue, it is critical to distinguish secondary assumption of the risk from primary assumption of the risk. If the issue in this case concerned the applicability of secondary assumption of the risk to strict liability actions, we would feel compelled to follow our decisions in *Springrose v. Willmore, supra*, and *Busch v. Busch Const. Inc.*, 262 N.W.2d 377, 394 (Minn. 1977), and hold that such conduct of the plaintiff should be treated as a type of contributory negligence and compared with the defendant's fault under our comparative fault statute, L.1978, c. 738, §§ 6, 7 (to be codified at Minn.St. 604.01, subds. 1, 1a).

■■■■ We are concerned, instead, with the issue of whether primary assumption of the risk is available in actions predicated upon strict liability. If the public policy underlying the theories of strict liability was so strong as to impose absolute liability and require that the defendant accept full responsibility for the injury, we would hold that a plaintiff may not legally consent to a release of the defendant's duty and therefore conclude that primary assumption of the risk was not applicable to action predicated upon strict liability. Cf. *Zerby v. Warren*, 297 Minn. 134, 210 N.W.2d 58 (1973); *Mayes v. Byers*, 214 Minn. 54, 7 N.W.2d 403 (1943); *Weber v. J. E. Barr Packing Corp.*, 182 Minn. 486, 234 N.W. 682 (1931); *Suess v. Arrowhead Steel Products Co.* 180 Minn. 21, 230 N.W. 125 (1930). See, generally, 60 Iowa L.Rev. 1. However, strict liability is not absolute liability, and we have on numerous occasions held that certain types of the plaintiff's conduct may provide a complete or partial bar to recovery in an action predicated upon strict liability. See, *Busch v. Busch Const. Inc. supra; Magnuson v. Rupp Manufacturing Co.*, 285 Minn. 32, 171 N.W.2d 201 (1969). See, generally, Comment, 3 Wm. Mitchell L.Rev.

---

1. An explanation for this position appears in Comment, 53 Ore.L.Rev. 79, 92, where the student author states: "The court faces a great interpretive pitfall if under the [comparative negligence] statute it attempts to compare and apportion the 'primary' sense of assumption of the risk in like manner as the plaintiff's contributory negligence. If the primary sense of assumption of the risk is equivalent to the duty issue, the court will be faced with the impossible conceptual task of apportioning duty. * *

"Consent is either totally present or totally absent. * * * [The plaintiff's] consent either entirely absolves the defendant or is entirely irrelevant." See, also, Note, 6 UCLA-Alaska L.Rev. 244.

241; Note, 2 Wm. Mitchell L.Rev. 235. Decisions from other jurisdictions indicate a similar position. Annotation, 46 A.L.R.3d 240; Note, 25 Drake L.Rev. 189. See, also, Restatement, Torts (2d), § 523 (assumption of risk is a defense in actions predicated upon strict liability for an abnormally dangerous activity). Implicit in these decisions is a recognition that the public policies underlying the theories of strict liability are not so strong as to remove the plaintiff's conduct from the court's consideration when assessing liability. In conformity with these decisions, we hold that a plaintiff may, implicitly or expressly, manifest his consent to relieve the defendant of his duty under the theories of strict liability, and, therefore, the doctrine of primary assumption of the risk may be utilized in actions based on strict products liability and strict liability for an abnormally dangerous activity.[2]

In the context of the instant case, the firemen's primary assumption of the risk may be invoked to relieve these other defendants of their duties, if any, with respect to reasonably apparent risks that are a part of firefighting. Even assuming the firemen can otherwise establish the elements of negligence per se, strict products liability, or strict liability for an abnormally dangerous activity, recovery on the basis of these theories is not available unless the injury was caused by a hidden or unanticipated risk.

c. Although there is abundant evidence of negligence or products defects which caused or contributed to the unfortunate and disastrous fire, the foregoing analysis demonstrates that the dispositive question in this case becomes: Is there a genuine issue of whether the risk of injury was reasonably apparent to the firemen? There is no question that the danger from the small fire at the pool of LP gas near the truck was reasonably apparent. Thus, it is clear that any negligence or product defect causing the initial fire provides no basis for recovery.

Our inquiry must be more detailed, however. The record indicates that the particular risk causing the deaths was a BLEVE. Still, the record is clear that the firemen in West St. Paul knew that when they encountered a fire at an LP gas storage facility a BLEVE was a reasonably apparent danger and one of the risks involved in fighting

---

**2.** We adopt the reasoning of Mr. Justice Ryan in his dissent in *Court v. Grzelinski*, 72 Ill.2d 141, 152, 19 Ill.Dec. 617, 622, 379 N.E.2d 281, 286 (1978): "The majority appears to be willing to apply the fireman's rule only in the 'limited context of landowner/occupier liability.' This implies that the majority would not permit a fireman to recover for injuries he receives in extinguishing a fire in my automobile which I caused by negligently pouring gasoline on the hot manifold if the automobile is parked in my driveway, but that he would be permitted to recover if my automobile is parked in the street. This appears to me not only to be extremely illogical but also to possibly present some constitutional questions. * * *

"* * * The majority opinion is in error * * * in equating assumption of risk as used in the fireman's rule with the affirmative defense in negligence and products liability cases. Under the fireman's rule assumption of risk is not an affirmative defense. It, instead, defines the duty that is owed to a fireman.

* * * * * *

"* * * It is not important in the application of the fireman's rule to determine what caused the particular danger which brought about the injury. Of critical importance is whether the particular danger is one that the fireman would anticipate in the performance of his duties."

See, also, *Pritchard v. Liggett & Myers Tobacco Co.*, 350 F.2d 479, 485 (3 Cir. 1965) (primary assumption of risk is available in actions for products liability based on breach of warranty), modified on other grounds, 370 F.2d 95 (3 Cir. 1966), certiorari denied, 382 U.S. 987, 86 S.Ct. 549, 15 L.Ed.2d 475 (1966).

We also find support for our conclusion in the recently enacted comparative "fault" statute which had previously been phrased in terms of comparative "negligence." L.1978, c. 738, §§ 6, 7. Under that statute, the fault of the plaintiff is compared with that of the defendant in assessing entitlement to and the amount of recovery. "Fault", within the meaning of the statute, includes "unreasonable assumption of risk *not constituting an express consent* * * *." (Italics supplied.) We find in this statute a legislative recognition that primary assumption of the risk remains a viable, complete bar to recovery in actions based on strict liability. We note, however, that implied, as well as express, consent may relieve the defendant of his duty even though the statute speaks only in terms of express consent.

such a fire.[3] The firemen poured water on the 11,000-gallon tank to cool it in an attempt to prevent the explosion. Unfortunately, the very thing the firemen anticipated, assumed, and feared could happen did in fact happen.

We are not persuaded by the argument that improper operation of the release valve made the risk of a BLEVE hidden or unanticipated. The record indicates that any improper operation of the valve affected only the likelihood of a BLEVE. The fact remains that the firemen knew a BLEVE could occur, even though, like with any risk, they did not know exactly when the danger would manifest itself. Therefore, any improper operation of the release valve merely increased the risk of a BLEVE; it did not remove the occurrence of a BLEVE from the risks reasonably anticipated by the West St. Paul firemen.

We must conclude as a matter of law that the firemen primarily assumed the risk under the facts of this case. They cannot, therefore, recover damages from any of the defendants.

2. Having determined that the firemen assumed the risk in the primary sense and recovery cannot be had against any of the defendants, we need not consider the remaining issues concerning the class of persons protected by fire codes, the applicability of strict products liability in favor of bystanders, or the question of whether the operation of an 11,000-gallon LP gas facility is an abnormally dangerous activity. Likewise, we need not pass on the issue raised by the city of West St. Paul concerning indemnity and contribution because it is moot.

Affirmed.

OTIS, J., took no part in the consideration or decision of this case.

---

**3.** After this fire, the methods of the West St. Paul Fire Department in dealing with gas storage tank fires has been changed. They now clear the area and let the tanks burn and explode.