705 So.2d 826 (1997)
Roosevelt FINLEY
v.
W. T. PATTERSON, et al.
1951647.
Supreme Court of Alabama.
June 13, 1997.
Rehearing Denied December 15, 1997.
*827 C. Michael Benson, Auburn; Timothy Davis, Alexander City; and J. Tom Radney, Alexander City, for appellant.
Micheal S. Jackson of Beers, Anderson, Jackson & Smith, P.C., Montgomery, for W. T. Patterson, as administrator.
SEE, Justice.
The issue in this case is whether, under the facts presented, Alabama law imposes an affirmative duty that subjects a homeowner to liability if she fails to warn a responding police officer that he may be in danger from a gunman who is inside the residence with the homeowner. The trial court held that, under the circumstances, the homeowner had no duty to warn the officer, and it directed a verdict for the defendant. We affirm.
Viewed in the light most favorable to the plaintiff, Roosevelt Finley, the evidence tended to show the following: In March 1991, Marquette Patterson refused the request of his grandmother, Annie Pearl Patterson, to leave her home, and then he threatened to take money from her. He loaded a shotgun, threatened to kill several family members, shot at one family member, and threatened to shoot at the police if they came.
The Camp Hill Police Department received a report of Marquette's actions and a request for assistance. Roosevelt Finley, the chief of police of Camp Hill, responded to the domestic disturbance dispatch about Marquette. The dispatcher informed Officer Finley that a gun was possibly involved. Another officer arrived on the scene and radioed that all seemed quiet, at least from the outside of the residence. Ms. Patterson's son, Marquette's uncle, who had been at the residence at the time of the disturbance, met Finley and approached the house with him.
Officer Finley had dealt with Marquette numerous times before. Ms. Patterson had always responded when Finley knocked at the door to see Marquette. Marquette had always calmed down after Finley talked to him.
This time was different. When Finley knocked on the door, no one responded. When Finley checked the door, he found it chained from the inside. When Finley called out, no one answered. Ms. Patterson's son, however, insisted that Marquette was inside.
As Finley walked off the porch, three shotgun blasts came through the window and struck him. There was an exchange of gunfire, and the police launched tear gas into the house. A small fire broke out. The shooting from inside the house stopped. The police entered. Marquette was dead from a self-inflicted gunshot wound. Ms. Patterson had died next to Marquette, in a kneeling position, possibly from smoke inhalation.
Finley sued Ms. Patterson's estate, seeking damages on theories of negligence and wantonness. The trial court directed a verdict for the estate explaining that the evidence was purely speculative as to whether Ms. Patterson could have warned Officer Finley of the danger posed by Marquette.
On appeal, Finley argues that the directed verdict was improper, contending that Ms. Patterson, as the premises owner, had a duty to warn him, as a police officer, of the danger posed by Marquette. Finley argues that Ms. Patterson's duty was created by what he considers to be a special relationship that existed or special circumstances surrounding Marquette's shooting of Finley.[1] For the directed verdict to be proper, Finley must have failed to present substantial evidence *828 of facts giving rise to a duty on the part of Ms. Patterson to protect him. See Teague v. Adams, 638 So.2d 836, 837 (Ala. 1994); Rule 50(a), Ala.R.Civ.P.
The general rule in Alabama is that "a person has no duty to protect another from criminal acts of a third person." Moye v. A.G. Gaston Motels, Inc., 499 So.2d 1368, 1370 (Ala.1986). There are two exceptions to this rule: (1) the "special relationship" exception; and (2) the "special circumstances" exception. Saccuzzo v. Krystal Co., 646 So.2d 595, 596 (Ala.1994) (citing Restatement (Second) of Torts § 315 (1965)).

1. "Special Relationship" Exception
The "special relationship" exception is drawn from Restatement § 315, which provides:
"There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

"(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
"(b) a special relation exists between the actor and the other which gives to the other a right to protection."

(Emphasis added.) The relationship between Ms. Patterson (the "actor") and Marquette (the "third person") was that of grandmother and adult grandson. This familial relationship imposed no duty on the elderly Ms. Patterson to control Marquette. See, e.g., Bell & Hudson, P.C. v. Buhl Realty Co., 185 Mich.App. 714, 462 N.W.2d 851 (1990) (holding familial relationship insufficient to impose a duty on defendant to protect plaintiff from wrongful acts of defendant's family member).
The relationship between Ms. Patterson (the "actor") and Finley (the "other") was that of citizen and police officer. This relationship is insufficient to create a right in Finley, the police officer, to require Ms. Patterson, the citizen, to protect him. In Young v. Huntsville Hospital, 595 So.2d 1386, 1388-89 (Ala.1992), we held that the relationship between a hospital and a sedated patient gave rise to a right in the sedated patient to have the hospital protect her from a sexual assault. In Thetford v. City of Clanton, 605 So.2d 835, 838-40 (Ala.1992), we held that an innkeeper had the duty to protect a guest, a battered wife who had informed the innkeeper that she was fleeing her husband, from unauthorized access to her room by her husband. In both Young and Thetford, the plaintiffs were completely dependent upon the defendants for protection. Unlike the sedated patient or the battered and fearful wife, Finley, the chief of police, was an armed, trained law enforcement officer with years of experience in dealing with domestic disputes and violent criminals. It cannot be maintained that Officer Finley was dependent on the elderly Ms. Patterson for protection. Accordingly, the "special relationship" exception did not impose a duty on Ms. Patterson to protect Finley from the criminal acts of the third party, Marquette.[2]

*829 2. "Special Circumstances" Exception

The second exception to the general rule that a person has no duty to protect another from the criminal acts of a third party is the "special circumstances" exception. It arises only in the rare case when the person "know[s] or [has] reason to know that acts are occurring or [are] about to occur on the premises that pose imminent probability of harm to an invitee." Nail v. Jefferson County Truck Growers Ass'n, Inc., 542 So.2d 1208, 1211 (Ala.1988) (quoting Cornpropst v. Sloan, 528 S.W.2d 188, 197-98 (Tenn.1975)). In the overwhelming majority of cases presenting the question, we have not found special circumstances that give rise to a duty to protect. See, e.g., Ortell v. Spencer Companies, 477 So.2d 299 (Ala.1985) (holding that 8 incidents of assault, theft, robbery, or burglary on the premises and 80 similar incidents within a 2-block area within the prior 3 years did not constitute "special circumstances" giving rise to a duty to protect); Henley v. Pizitz Realty Co., 456 So.2d 272 (Ala.1984) (holding that 1 battery, 6 breakings and enterings of cars, 2 robberies, and 7 thefts in a parking deck within the prior 10 years did not constitute "special circumstances" giving rise to a duty to protect).
However, Nail, supra, is that rare case in which this Court found special circumstances giving rise to a duty to protecta duty on the part of the operator of a farmers' market to take reasonable steps to protect a threatened tenant who was an invitee. The special circumstances were that the operator was aware that for several weeks hostility had grown between two tenants at the farmers' market and that the operator had received two specific warnings that an outbreak of violence was imminent. Nail, 542 So.2d at 1212-13.[3]
Finley argues that special circumstances are established in this case by evidence that Ms. Patterson knew that Marquette had the shotgun and knew that he had made a statement about shooting the police. Thus, Finley argues, Ms. Patterson must have known that harm to Finley was imminent. For one to have a duty to warn, however, one must have a reasonable opportunity to warn. See Richard C. Tinney, Liability to PoliceOwner or Occupant, 30 A.L.R.4th 81, 97 (1984) (citing Armstrong v. Mailand, 284 N.W.2d 343 (Minn.1979)). Finley offered evidence that Ms. Patterson, although she was over 80 years of age, could see, hear, walk, and talk; and he argues that she could have felt safe in warning him from the house because Marquette had never harmed her. While there is significant evidence rebutting the inference that Ms. Patterson's prior relationship with Marquette would allow her to feel safe in warning Finley on the day of the shooting (e.g., Marquette's threat to take Ms. Patterson's money, his refusal to leave her home, his shooting at a family member, etc.), there was no evidence of the ultimately fatal situation that existed inside Ms. Patterson's home when Finley knocked on the door. Any conclusion that Ms. Patterson had, or *830 did not have, a reasonably safe opportunity to warn Finley would be mere speculation. "Evidence ... which affords nothing more than mere speculation, conjecture, or guess is insufficient to warrant the submission of a case to the jury." Sprayberry v. First Nat'l Bank, 465 So.2d 1111, 1114 (Ala.1984). Thus, the evidence did not indicate sufficient special circumstances to impose a duty on Ms. Patterson to warn Finley.[4] The trial court properly directed a verdict against Finley.
The judgment of the trial court is affirmed.
AFFIRMED.
HOOPER, C.J., and MADDOX, ALMON, and SHORES, JJ., concur.
COOK, J., concurs in the result.
HOUSTON, KENNEDY, and BUTTS, JJ., dissent.
HOUSTON, Justice (dissenting).
A directed verdict is proper only where the nonmoving party has failed to present sufficient evidence regarding some element essential to his claim or where there is no disputed issue of fact upon which reasonable persons could differ. Because a trial judge's ruling on a directed verdict motion is based on an objective standard, and, thus, is not discretionary, review of a directed verdict on appeal is de novo. In considering the record on appeal from a judgment based on a directed verdict, this Court must view all the evidence in the light most favorable to the nonmovant and must entertain such reasonable evidentiary inferences as the jury would have been free to draw. Teague v. Adams, 638 So.2d 836 (Ala.1994).
The evidence in the present case, viewed in the light most favorable to Finley, indicates the following: On March 17, 1991, Finley, in his capacity as the chief of police and public safety director for the Town of Camp Hill, Alabama, was dispatched by radio to a domestic disturbance at the home of Annie Pearl Patterson. Although the dispatcher's message was not entirely clear, the dispatcher informed Finley that a gun was possibly involved and she told him to meet with the complainant, W. T. Patterson (one of Ms. Patterson's sons), at a local restaurant before proceeding to the scene. W. T. Patterson told Finley that his nephew, Marquette Patterson, was at W. T.'s mother's house and was threatening to take some of her money. W. T. did not tell Finley that his nephew Marquette had a shotgun and that Marquette had shot at W. T.'s brother, Theodis Patterson (Marquette's uncle).
While en route to Ms. Patterson's house, Finley received a radio message from an officer from another police jurisdiction, James Nelms, informing him that he was already at the scene, that everything appeared to be quiet, and that he would be standing by to assist upon Finley's arrival. Based upon the information that had been provided to him, Finley did not consider the call to constitute an emergency and he proceeded to Ms. Patterson's house in a nonemergency manner. This was not the first time Finley had had to deal with Marquette Patterson. Finley had responded to numerous domestic disturbances involving Marquette. In each of those instances, Finley had been able to calm Marquette down merely by talking to him. Finley had never had to use handcuffs or a gun on Marquette, and Marquette had never attempted to pull a gun on him. Finley had responded to disturbance calls involving Marquette at both Marquette's house and Ms. Patterson's house. Both Marquette and Ms. Patterson were familiar *831 with Finley's voice. Ms. Patterson and Marquette had a very close relationship; she was capable of exercising a great deal of influence over Marquette, and on occasion she had assisted Finley in controlling him.
When Finley arrived at Ms. Patterson's house, he met with W. T. Patterson and Nelms and they all approached the house. Finley's clearly marked police car was parked where it could be seen from the front and one side of the house, and Finley was wearing a police uniform. W. T. Patterson and Finley went to the front door, and Nelms proceeded to the rear of the house. Finley knocked loudly on the front door with a heavy metal flashlight and called out to see if Marquette was in the house. After getting no response from anyone inside the house, and after W. T. Patterson had been unsuccessful in opening the door with his key (the door was blocked or latched from the inside), Finley concluded that either no one was in the house or someone had locked himself in the house and that there was little more that he could do at that time. He advised his dispatcher by radio that he was completed. Finley's refusal to force his way into the house angered W. T. Patterson, who continued to insist that Finley should do more. During this conversation, W. T. Patterson never said anything about Marquette's having had and fired a gun earlier, nor did he express concern that his mother had not responded to the door. In Finley's past experiences with Ms. Patterson, she had always responded when he knocked on her door. At this point, neither Finley nor Nelms had been told anything to substantiate the dispatcher's statement that a gun had possibly been involved in the earlier disturbance, and neither officer believed that he was in any particular danger. However, as Finley was walking off the porch Marquette shot him three times with a shotgun through a window in the house. Finley, who suffered near fatal personal injuries from those gunshots, was eventually rescued by other police officers and taken to a hospital. After an exchange of gunfire between Marquette and the other officers, during which the police used tear gas in an attempt to force Marquette out of the house, the shooting from inside the house stopped. The police entered the house, which had caught fire, and discovered that Marquette had died in the house of a self-inflicted gunshot. The police also discovered that Ms. Patterson had died in the altercation. Her body was found next to Marquette's, in a kneeling position. The position of Ms. Patterson's body suggested that she had died after Finley was shot, possibly of smoke inhalation.
A subsequent investigation of the incident revealed that Marquette had come to Ms. Patterson's house earlier on the day of the shooting and that Ms. Patterson had asked him to leave. Ms. Patterson had expressed concern that his being at her house would get her into trouble. (The record indicates that Marquette had been ordered by a judge to leave the state.) Not long after being asked by Ms. Patterson to leave the house, Marquette, who was in an agitated state of mind, was heard assembling a gun and dropping bullets or shells onto the floor. Marquette had stated that he intended to kill his wife, his father (MacArthur Patterson), and his uncle Theodis, and had stated that if he had to he would "drop" the police. Ms. Patterson was in the house in a nearby "sitting room" or "den" when Marquette stated that he would "drop" the police. Ms. Patterson was close enough to hear Marquette's threats and she was aware that Marquette had a shotgun. At some point during all of this, Marquette shot out the front door at Theodis Patterson, who, along with W. T. Patterson, had attempted to intervene. Both men were standing in the yard at that time. Ms. Patterson was aware that Marquette had shot at her son and she was either aware or should have been aware that W. T. Patterson had gone to get the police. During the entire altercation, no one heard Marquette threaten Ms. Patterson, who ultimately decided to stay in the house, apparently to protect either some money (part of which was hers and part of which belonged to another person) or Marquette. Ms. Patterson appeared to be more afraid of getting into trouble with the police if Marquette was found in her house than she was of being harmed by Marquette. At the time of the incident, Ms. Patterson, although she was over 80 years of age, was generally of sound mind, and she could see, *832 hear, walk, and talk. There was a working telephone inside the house that she was capable of using. At no time did Ms. Patterson notify the police by telephone that a clearly disturbed Marquette had locked himself in her house with a shotgun, and at no time did Ms. Patterson call out to Finley or Nelms to warn that they were in danger of being shot.
Finley filed this action against Ms. Patterson's estate, alleging negligence and wantonness on Ms. Patterson's part in failing to warn him that Marquette was on the premises with a loaded shotgun and that he was in the frame of mind to use it against the police. The trial judge directed a verdict for the estate at the close of Finley's case-in-chief, explaining that, in his opinion, the evidence was purely speculative as to whether Ms. Patterson could have warned Finley of the impending danger posed by Marquette.
In Saccuzzo v. Krystal Co., 646 So.2d 595, 596 (Ala.1994), this Court stated:
"The general rule in Alabama is that `absent special relationships or circumstances, a person has no duty to protect another from criminal acts of a third person.' Moye v. A.G. Gaston Motels, Inc., 499 So.2d 1368, 1370 (Ala.1986). `Special circumstances' exist only when the defendant `knew or had reason to know of a probability of conduct by third persons that would endanger the plaintiff.' Nail v. Jefferson County Truck Growers Association, Inc., 542 So.2d 1208, 1211 (Ala.1988). For the `special relationship' exception to apply, there must be a relationship either between the premises owner and the third party or between the premises owner and the plaintiff. Young v. Huntsville Hospital, 595 So.2d 1386 (Ala.1992), citing Restatement (Second) of Torts, § 315 (1965). Prior criminal incidents can indicate knowledge on the part of the owner, but such incidents are by no means conclusive on the question of knowledge. Williams v. First Alabama Bank, 545 So.2d 26, 27 (Ala.1989)."[5] *833 My review of the evidence does not indicate that there was the kind of special relationship between Ms. Patterson and Marquette or between Ms. Patterson and Finley that would have imposed a duty on Ms. Patterson to protect Finley from Marquette. Neither Ms. Patterson's familial relationship with Marquette, nor her occasional contact with Finley in his capacity as a police officer, approaches the kind of relationship that would create on Finley's part a unique dependence on Ms. Patterson for protection. For examples of cases where such a special relationship has been found, see Thetford v. City of Clanton, 605 So.2d 835 (Ala.1992) (innkeeper-guest); and Young v. Huntsville Hospital, 595 So.2d 1386 (Ala.1992) (hospital-incapacitated patient).
The existence of special circumstances may, however, create a duty on the part of a premises owner to take reasonable steps to protect another from the criminal acts of a third party. Those circumstances exist only when the premises owner knows or has reason to know of a probability of conduct by a third party that will endanger the plaintiff. This exception to the general rule of nonliability arises where the particular criminal conduct is foreseeable to the premises owner. Moye v. A.G. Gaston Motels, Inc., supra. This Court recognized in Moye that it is difficult to impose such a duty on a premises owner, even when previous criminal incidents are cited as evidence that the premises owner knew that future criminal activity on the premises was foreseeable. However, it is not impossible to impose such a duty. Although evidence of previous criminal incidents may be used to establish knowledge on the part of a premises owner, other evidence may also suffice, provided it indicates that the premises owner knew or had reason to know of a probability of criminal conduct by a third party that would endanger the plaintiff.
After carefully reviewing the evidence, and after indulging all reasonable inferences in favor of Finley, I conclude that Finley presented sufficient evidence to have his claims considered by the jury. The evidence indicated that Ms. Patterson was aware of two important things on the day of the shootingthat Finley had come to her house in his capacity as a police officer to investigate a reported domestic disturbance there and that a clearly disturbed and armed Marquette was hiding on the premises and threatening to kill family members and police officers. Although the evidence does not disclose that Marquette had a history of domestic violence involving the use of a gun, I nonetheless conclude that the evidence of Ms. Patterson's knowledge of Marquette's bizarre and particularly vicious behavior on the day of the shooting, coupled with the evidence of her knowledge that Finley, based on his previous experiences with Marquette, would not be suspecting Marquette to assault him with a shotgun, created a question for the jury as to whether Marquette's "ambush" of Finley was foreseeable to Ms. Patterson (i.e., whether she knew or had reason to know that Marquette, given his state of mind, would probably shoot at an unsuspecting police officer). Such "specialized knowledge" that criminal activity is a probability is sufficient, in my opinion, to create a duty on the part of a premises owner to take steps to protect a licensee or an invitee present on the premises. Moye, supra. I would order a new trial and would require that the jury be instructed that if it found that Marquette's assault on Finley was foreseeable to Ms. Patterson, then Ms. Patterson was under a duty to alert Finley of the danger.
The evidence, again viewed in the light most favorable to Finley, as it must be under our standard of review, also indicates to me that Ms. Patterson was physically and mentally able to warn Finley of the danger. The evidence indicated that Ms. Patterson was generally of sound mind and that she could walk, talk, see, and hear (how well she could do those things was a question for the jury); that she had always been very close to, and able to talk with, Marquette; that her movements within the house and her ability to speak were not restricted (there is no evidence that she was held hostage by Marquette); and that she had been alive when Finley was shot. The exact reason or reasons why Ms. Patterson took no steps to alert Finley of Marquette's presence may never be known. However, one could reasonably infer from the evidence that Ms. Patterson was capable of warning Finley of *834 the danger posed by Marquette. Whether Ms. Patterson could have warned Finley and whether she acted reasonably or unreasonably in not doing so, or whether she acted in conscious disregard of the circumstances, are all questions better reserved to the factfinder. I conclude only that the evidence was sufficient to submit to the jury the question whether Ms. Patterson had a duty to warn Finley of the danger lurking within her house, and, if so, whether she breached that duty.
There was evidence of the standing relationship between Ms. Patterson and her grandson, Marquette, from which the trier of facts could reasonably infer that Ms. Patterson could have warned Finley or Nelms, without physical danger to herself; but, in my opinion, that was a decision for the trier of the facts, not for the trial court or this appellate court. I fear that the majority's decision today will make law enforcement officers sitting ducks when they are on private property doing their legal duty, because the majority opinion holds that, as a matter of law, law enforcement officers assume the risk of physical danger inherent in police work. I cannot go that far. I am fully aware of the policy arguments that can be made against allowing law enforcement officers to recover damages from premises owners for injuries arising out of dangers that are inherent in police work. See Premises Liability "Persons," § 6.4 (2d ed. 1995). Police officers face many dangers in the line of duty, dangers that naturally and predictably arise from face-to-face encounters with criminals and desperate situations. However, I do not think that it is necessarily an inherent risk of police work that a premises owner, who is aware of a police officer's presence, will not alert that police officer to a concealed and dangerous condition (person) on the premises, if the premises owner is aware of the dangerous condition and is physically and mentally capable of providing a simple warning without physical danger to the premises owner. For a case somewhat similar to this one, see Williams v. Wiewel, 36 Ill.App.3d 478, 344 N.E.2d 34 (1976).
For the foregoing reasons, I would reverse the judgment and remand the case for further proceedings.
NOTES
[1] Finley also argues, separately, that Ms. Patterson should be liable under two additional theories: (1) the traditional premises-owner liability theory; and (2) the affirmative-conduct-of-premises owner theory. Finley, a licensee under the holding of Louisville & N.R.R. v. Griswold, 241 Ala. 104, 106, 1 So.2d 393, 395 (1941), cannot recover under the traditional premises-owner theory because the general rule that a person is not liable for the criminal acts of third parties applies to premises owners like Ms. Patterson. See Moye v. A.G. Gaston Motels, Inc., 499 So.2d 1368 (Ala.1986) (holding that premises owner was not liable to invitee who was shot by third party where special circumstances did not exist). Likewise, Finley cannot recover under the affirmative-conduct theory because he does not allege that Ms. Patterson took any affirmative action. Cf. Orr v. Turney, 535 So.2d 150 (Ala.1988) (holding that premises owner owed higher duty of reasonable care to visitor, instead of lower duty to licensee, where owner's affirmative conduct of running with a pan of hot grease created a risk to a visiting child).
[2] We note that it would be peculiar to impose a duty on a person to warn a police officer, like Finley, of the very dangers inherent in police work and which the officer voluntarily assumed as part of his duties. See Sprouse v. Belcher Oil Co., 577 So.2d 443, 444 (Ala.1991) (stating that assumption of the risk requires knowledge of the danger, appreciation of the danger, and voluntary exposure to the danger). This Court has recognized "the harsh reality that crime can and does occur despite society's best efforts to prevent it." Moye v. A.G. Gaston Motels, Inc., 499 So.2d 1368, 1372 (Ala.1986). It is the police officer's courage and sense of duty that society depends on for protection against violent criminals. The debt society owes its law enforcement officers, however, is not responsibly laid on property owners, by this Court's invention of a new tort action.

We also note that other jurisdictions have addressed this issue and have concluded that a premises owner cannot be held liable for injuries sustained by a police officer when the officer is acting in the line of duty. See, e.g., Lenthall v. Maxwell, 138 Cal.App.3d 716, 188 Cal.Rptr. 260 (1982) (holding police officer who was shot by occupier of premises could not recover from premises owner for injuries the officer should have reasonably expected to sustain while engaged in the line of duty); Fancil v. Q.S.E. Foods, Inc., 60 Ill.2d 552, 328 N.E.2d 538 (1975) (holding premises owner had no duty to protect when the risk the police officer was subjected to was one inherent in that occupation); Koop v. Bailey, 502 N.E.2d 116 (Ind.App.1986) (holding homeowners not liable to member of police SWAT team who was shot by the homeowners' son while the officer responded in his professional capacity); Chapman v. Craig, 431 N.W.2d 770 (Iowa 1988) (holding tavern owner not liable for injuries sustained when intoxicated patron assaulted a police officer); Hannah v. Jensen, 298 N.W.2d 52 (Minn.1980) (holding owner of bar not liable for injuries to officer caused by a scuffle with a person the owner wanted removed from the premises); Wawrzyniak v. Sherk, 170 A.D.2d 972, 566 N.Y.S.2d 138 (1991) (holding officer unable to recover for injuries caused by the arrestee's mother when she lunged toward officer who was arresting her son, because apprehension of suspects is within the scope of police duties); Kithcart v. Feldman, 89 Okla. 276, 215 P. 419 (1923) (holding officer who was shot by employee of a hotel while he was attempting to make an arrest was unable to recover for injuries from hotel owner); Cullivan v. Leston, 43 Or.App. 361, 602 P.2d 1121 (1979) (holding proprietor of a tavern was not liable to officer who sustained injuries caused by a patron while the officer was attempting to make an arrest); Carson v. Headrick, 900 S.W.2d 685 (Tenn.1995) (holding wife did not have a duty to warn a police officer, who was shot while escorting her home, that her husband had threatened to kill any police officer).
[3] We note that in Nail, 542 So.2d at 1211, we held, applying the "scintilla rule" of evidence, that there was sufficient evidence for a jury to find an imminent probability of harm. Alabama has since abandoned the scintilla rule in favor of the significantly higher standard of "substantial evidence." See Ala.Code 1975, § 12-21-12; Brown v. Gamble, 537 So.2d 476, 477 (Ala.1989) (stating that cases filed after June 11, 1987, are subject to the substantial evidence rule instead of the scintilla rule).
[4] The dissent relies on an Illinois case, Williams v. Wiewel, 36 Ill.App.3d 478, 344 N.E.2d 34 (1976), for its conclusion that because of Ms. Patterson's failure to warn, the issue whether her estate should be held liable for Marquette's shooting of Finley was for the jury. In Williams, 36 Ill.App.3d at 480, 344 N.E.2d at 36, however, it was not the criminals (burglars) who shot the law enforcement officer, but another person called there by the defendant to help catch the burglars, without the defendant's having warned either that person or the officer of the other's presence. It should also be noted that the Illinois Supreme Court has held that, because "[t]he danger of being ambushed by criminals lurking in poorly illuminated areas, in shadows or behind objects is a risk inherent in the occupation [of a law enforcement officer]," a premises owner cannot be held liable for dangerous conditions on the premises. Fancil v. Q.S.E. Foods, Inc., 60 Ill.2d 552, 558, 328 N.E.2d 538, 541 (1975).
[5] I note Finley's contention that he should be classified as an invitee for purposes of determining whether Ms. Patterson was under a duty to warn him of the danger posed by Marquette. In the only Alabama case I have found dealing with this question, this Court stated:

"An officer of the law, acting in the line of duty, is not a trespasser. Neither is he an invitee to whom the [premises owner] owes a duty to keep [the] premises in a reasonably safe condition. He is deemed a licensee, free to enter on the premises as they are, caring for his own safety as for any hazards on the premises ...."
Louisville & N.R.R. v. Griswold, 241 Ala. 104, 106, 1 So.2d 393, 395 (1941). There is a split of authority as to whether a police officer should be classified as an invitee or as a licensee. See Harper, James, & Gray, The Law of Torts, § 27.14(2) (2d ed. 1986); Premises Liability "Persons", § 6.1 (2d ed. 1995); J. Page, The Law of Premises Liability, § 5.9 (2d ed. 1988); 62 Am. Jur.2d Premises Liability §§ 422-424 (1990). Based on the record before me, I find it unnecessary to classify Finley as either a licensee or an invitee. Finley's action is based on allegations that Ms. Patterson was under a duty to warn him that a criminal act was about to be committed by a third party. The duty discussed in Saccuzzo, supra, and in a well-established line of Alabama cases dealing with a premises owner's liability for the criminal acts of a third party, is applicable in this case regardless of whether Finley is classified as an invitee or as a licensee. See, e.g., Moye v. A.G. Gaston Motels, Inc., 499 So.2d 1368 (Ala.1986) (involving the more typical situation where the injured person is an invitee on the premises); and Prentiss v. Evergreen Presbyterian Church, 644 So.2d 475 (Ala.1994) (recognizing the general rule that a premises owner owes a licensee not only a duty to abstain from willfully or wantonly injuring the licensee, but also a duty to avoid negligently injuring the licensee after the premises owner discovers that the licensee is in danger).
At this point I note that I also find unpersuasive Finley's contention that this case is controlled by Orr v. Turney, 535 So.2d 150 (Ala. 1988). I view the present case as involving a dangerous condition on the premises that Ms. Patterson allegedly was aware of and negligently or wantonly failed to warn Finley of. See, e.g., King v. Breen, 560 So.2d 186 (Ala.1990) (dangerous animal on the premises held to be a dangerous condition); Casey v. Oliver, 577 So.2d 453 (Ala.1991) (medication left where child could easily get to it held to be a dangerous condition); Baldwin v. Gartman, 604 So.2d 347 (Ala.1992) (slab of concrete left balanced on a dolly held to be a dangerous condition). In Orr the premises owner injured a licensee (child) when, while running with a pan of burning grease, she spilled some on the child. That conduct had nothing to do with the condition of the premises (i.e., the premises owner's affirmative conduct was the immediate cause of the injury). See Baldwin v. Gartman, supra. The present case does not involve allegations of the kind of "active" or "affirmative" conduct or negligence on the part of a premises owner that would invoke the standard discussed in Orr.